## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Quicksilver Resources Inc., <u>et al.</u>,[1] | Case No. 15-10585 (LSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: April 27, 2015 at 2:00 p.m. (ET)**<br>**Objection Deadline: April 8, 2015 at 4:00 p.m. (ET)**<br>**(Extended for the Committee to April 20, 2015 at**<br>**5:00 p.m. (ET))** |
| | **Re: Docket No. 16** |

## OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS (A) AUTHORIZING THE USE OF CASH COLLATERAL, (B) GRANTING PREPETITION SECURED PARTIES ADEQUATE PROTECTION, (C) SCHEDULING A FINAL HEARING, AND (D) GRANTING RELATED RELIEF

The Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Quicksilver Resources Inc., *et al.* (collectively, the "<u>Debtors</u>"), by and through its proposed undersigned counsel, hereby files this objection (the "<u>Objection</u>") to the *Debtors' Motion for Entry of Interim and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Prepetition Secured Parties Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief* [D.I. 16] (the "<u>Motion</u>").[2] In support of the Objection, the Committee respectfully represents as follows:

---

[1]    The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Quicksilver Resources Inc. [6163]; Barnett Shale Operating LLC [0257]; Cowtown Drilling, Inc. [8899]; Cowtown Gas Processing L.P. [1404]; Cowtown Pipeline Funding, Inc. [9774]; Cowtown Pipeline L.P. [9769]; Cowtown Pipeline Management, Inc. [9771]; Makarios Resources International Holdings LLC [1765]; Makarios Resources International Inc. [7612]; QPP Holdings LLC [0057]; QPP Parent LLC [8748]; Quicksilver Production Partners GP LLC [2701]; Quicksilver Production Partners LP [9129]; and Silver Stream Pipeline Company LLC [9384]. The Debtors' address is 801 Cherry Street, Suite 3700, Unit 19, Fort Worth, Texas 76102.

[2]    Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to them in the Motion.

## PRELIMINARY STATEMENT

It has become almost customary for debtors in large chapter 11 cases to provide overly generous adequate protection packages, which cut off many of the rights of unsecured creditors, to prepetition undersecured lenders who hold liens on substantially all of the debtor's assets and who are the only parties willing or able to provide DIP financing.  With a stranglehold over a debtor's liquidity (and, thus, wielding the key to the company's continued survival), undersecured lenders are often able to extract a laundry list of "perks" from the debtor for the provision of DIP financing and use of their cash collateral because the debtor simply cannot meet the legal standards for use of their collateral.  These Debtors are in a far better position *vis-à-vis* their secured lenders.  They can meet the legal standards for use of the secured lenders' collateral without their consent.  Yet they have chosen to provide the secured lenders with a wholly unnecessary and overreaching adequate protection package that is inappropriate under the circumstances of these cases.

The Debtors have not sought DIP financing given their ability to fund operations with unencumbered cash on hand.  At the Petition Date, the Debtors possessed *approximately $167.5 million in unencumbered cash* plus very substantial unencumbered properties and other assets as described below.  The Debtors have expressly acknowledged that *there may not have been any cash collateral whatsoever* at the outset of these chapter 11 cases.  The Debtors admit that they will rely on the unencumbered cash to fund these chapter 11 cases, thus preserving and enhancing the value of the prepetition secured parties' collateral.

By contrast, cash collateral (if any) being generated is simply being redeployed to operate assets that are subject to the prepetition secured parties' liens and security interests.  Chapter 11's cost-cutting tools (*i.e.*, rejection of uneconomic contracts) and the Debtors' use of unencumbered cash to satisfy necessary capital and operating expenses will protect and likely enhance the value of

the prepetition secured parties' collateral. In sum, the Debtors do not need to provide the prepetition secured parties with the egregious adequate protection package that they seek in order to satisfy the legal standard for use of their collateral.

Nevertheless, as "adequate protection" for the use of the prepetition secured parties' "cash collateral" (to the extent that any such cash collateral even exists or will be generated postpetition), the Debtors seek authorization to grant the prepetition secured parties an oversized adequate protection package that includes, among other things:  (i) interest payments to the ***undersecured*** second lien lenders totaling approximately $29.7 million and $72.9 million (including $14.3 million in prepetition interest) over the next 13 weeks and 52 weeks, respectively, ***which payments appear to be funded solely by the unencumbered cash***; (ii) likely millions of dollars of professional fees and expenses to fund numerous sets of professionals, including the legal counsel, financial advisors and other professionals for the Second Lien Agent, the Ad Hoc Group of Second Lienholders and the Second Lien Indenture Trustee ((i) and (ii), together, the "Adequate Protection Payments");[3] (iii) liens on all of the unencumbered property (including liens on the proceeds of avoidance actions); (iv) notwithstanding that the Debtors project to use a substantial amount of unencumbered cash to fund these cases, waivers of the "equities of the case" exception under section 552(b) of the Bankruptcy Code and the right to surcharge the prepetition collateral pursuant to section 506(c) of the Bankruptcy Code; and (v) superpriority 507(b) claims calculated in a way that greatly exceeds what the Bankruptcy Code permits.

There is no evidence that the prepetition collateral is declining in value or that any of the expensive "goodies" described above are required to meet the Debtors' adequate protection burden. Nor have the prepetition secured parties described what, exactly, they need to be "adequately

---

[3]    The Committee has no objection to payment of postpetition interest and fees to presumably oversecured first lien lenders.

protected" from, given that the imposition of the automatic stay and continued operation of the wells actually saves them from exercising costly, value-eroding remedies against the prepetition collateral—such as foreclosing on potentially thousands of leases or "shutting in" hundreds of wells—which they likely would not pursue even if the Debtors did not file for chapter 11 relief.

There is certainly no justification for waivers of the protections of sections 552(b) and 506(c) of the Bankruptcy Code; rather, this is precisely the situation such provisions were designed to address (*i.e.*, where the estate uses unencumbered assets for the benefit of secured parties). There is also no correlation between any projected diminution in collateral value and the $72.9 million in interest payments over the next 52 weeks *plus* fees for multiple sets of professional advisors that the Debtors propose to pay the undersecured second lien parties.

In any event, there is no need to begin making cash interest payments at this early stage. At the current projected cash burn rate, the Debtors will eat through all $167.5 million of their unencumbered cash within a year.[4] Pursuant to the Interim Order, the second lien parties are free at any time in the future to ask for additional adequate protection in the form of cash payments at such time (if ever) as an actual quantifiable diminution in value can be demonstrated. There is no justification today to spend almost half of the estates' unencumbered cash on postpetition interest payments to undersecured creditors. Further compounding this premature request is that recharacterizing such payments as payments of principal will neither bring needed funds back into the estate nor remedy the issue. Recharacterization will merely reduce the undersecured second lien parties' deficiency claim, which may be of little benefit to unsecured creditors since interest payments to the undersecured creditors will have consumed one of the primary assets that could have otherwise satisfied unsecured claims—the Debtors' unencumbered cash. Certain other aspects of the

---

[4]    Based on the cash burn rate in the Debtors' 13-week cash forecast.

proposed Final Order, including the period for the Committee's investigation of prepetition liens and claims and final Court approval of the repayment of $46.5 million of U.S. first lien debt at the outset of these cases using the proceeds of hedge unwinds, are also inequitable given the circumstances of these chapter 11 cases.

An adequate protection package consisting of replacement liens and superpriority claims assertable against hundreds of millions of dollars of unencumbered value, coupled with the continued operation of the wells, is more than sufficient under these unique circumstances. Adequate protection is meant to protect secured parties only to the extent of any diminution in the value of their collateral—not to allow undersecured creditors to profit at unsecured creditors' expense. Accordingly, the Court should not grant the Motion unless the prepetition secured parties' excessive adequate protection package is scaled back to that which is required to meet the Debtors' burden and the Final Order is modified as described herein.[5]

## BACKGROUND

### A.  Pre-Petition Capital Structure

1.      As of the Petition Date, the Debtors' outstanding secured indebtedness totaled approximately $1.098 billion in the aggregate and was comprised of the following:   (i) approximately $273 million in first lien indebtedness under the Combined Credit Agreements; (ii) a

---

[5]    At the first-day hearing, the Court took issue with the Debtors' unwillingness to segregate cash collateral (to the extent any exists) and third-party cash from Unencumbered Cash. Specifically, the Court noted: "I'm emphasizing that everything is on the table for the final hearing including the collateral package and the segregation issue. And the Debtors should be giving some thought to how they're going to address that issue and take appropriate, have what actions they're going to take between now and that hearing if they need to address that issue." Transcript of Hearing at 126, *In re Quicksilver Resources Inc.*, Case No. 15-10585 (LSS) (Bankr. D. Del. Mar. 19, 2015) (the "First-Day Hearing Transcript"). A copy of the First-Day Hearing Transcript is attached hereto as Exhibit A.  In response to the Court's concerns, the Debtors have promised to share a cash segregation and tracking proposal with the Committee.  To date, however, the Committee has only received an informal proposal from the Debtors.  Because the Committee has not received (and, thus, cannot yet evaluate) the Debtors' official cash segregation and tracking proposal, the Committee reserves all rights to object to such proposal at the appropriate time, including in connection with an objection to the *Debtors' Motion for (A) Authority to (I) Continue Using Existing Cash Management System, (II) Honor Certain Prepetition Obligations Related to the Use of the Cash Management System, and (III) Maintain Existing Bank Accounts and Business Forms; and (B) an Extension of Time to Comply with Bankruptcy Code Section 345(b)* [Docket No. 8].

$625 million second lien term loan; and (iii) $200 million in second lien floating rate notes due 2019.

2.    The Debtors' outstanding unsecured indebtedness totaled $975 million as of the Petition Date, comprised of: (i) $300 million of 9.125% senior notes due 2019; (ii) $325 million of 11.00% senior notes due 2021; and (iii) $350 million of 7.125% senior subordinated notes due 2016.

3.    According to the Debtors, their unencumbered assets include, without limitation (collectively, the "Unencumbered Property"): (i) approximately $167.5 million of cash and cash equivalents previously borrowed under the U.S. credit facility and currently deposited in certain investment accounts (the "Unencumbered Cash"); (ii) oil and gas leases and wells owned by QRI in Pecos, Upton, Reeves, Presidio, Culberson and Crockett Counties, Texas (the "Unencumbered West Texas Assets"); (iii) that certain Amended and Restated Intercompany Note, dated as of October 7, 2011, by and among QRI, QRCI, Cowtown Pipeline Funding, Inc., Cowtown Pipeline Management, Inc., Cowtown Pipeline L.P. and Cowtown Gas Processing L.P. with a face value of approximately $413 million (the "Intercompany Note"); (iv) approximately 8.1% of the total value of proved hydrocarbon interests owned by QRI in the Barnett Shale located in the Fort Worth basin of North Texas, pursuant to the last reserve report delivered prior to the date of this motion to the administrative agent in accordance with the U.S. credit agreement (the "Unencumbered Barnett Assets"); (v) certain other non-oil and gas real property and the personal property related thereto, including, but not limited to, surface lands, inventory and prepayments received by the Debtors;[6] and (vi) 35% of the equity interests of non-Debtor Canadian entity Quicksilver Resources Canada Inc.

---

[6]    Such other unencumbered property includes "two parcels of surface rights listed for sale at approximately $7 million each, surface right parcel with current $2.5 million offer, and $7.5 million tax refund filed with IRS (subject to its comment/disapproval)." Quicksilver Resources Inc., Current Report (Form 8-K) (Mar. 17, 2015), Exhibit 99.2 at 26. A copy of Exhibit 99.2 to the March 17, 2015 8-K is attached hereto as Exhibit B. This Court may take judicial notice of documents filed with the SEC. *Oran* v. *Stafford*, 226 F.3d 275, 289 (3d Cir. 2000). Additionally, in the Third Circuit, courts may take judicial notice of public records to acknowledge that the facts contained in the record existed in the public realm. *Benak* v. *Alliance Capital Mgmt. L.P.*, 435 F.3d 396, 401 n.15 (3d Cir. 2006).

and Quicksilver Production Partners Operating Ltd. (the former of which is pledged only to presumably oversecured First Lien Parties under the Canadian Credit Agreement).

**B.    Chapter 11 Filing and Postpetition Activities**

4.    On March 17, 2015 (the "Petition Date"), the Debtors filed voluntary petitions for reorganization under chapter 11 of the Bankruptcy Code with the United States Bankruptcy Court for the District of Delaware (the "Court").

5.    On March 25, 2015, the United States Trustee for the District of Delaware appointed a five (5) member Committee pursuant to section 1102(a)(1) of the Bankruptcy Code [Docket No. 119].[7]

6.    On the Petition Date, the Debtors filed the Motion, and on March 19, 2015, the Court approved the *Interim Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules 2002, 4004 and 9014 (I) Authorizing Debtors to Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling a Final Hearing Pursuant to Bankruptcy Rule 4001(b)* [Docket No. 97] (the "Interim Order").

7.    Since the Petition Date, the Debtors have terminated substantially all of their commodity derivatives, resulting in cash proceeds of $46.5 million. Quicksilver Resources Inc., Annual Report (Form 10-K) (Mar. 31, 2015) at 58.[8] The Debtors have used or expect to use all such cash proceeds to repay outstanding first lien indebtedness under the U.S. Credit Agreement (the "First Lien Repayment"). *Id.* While the First Lien Repayment was permitted under the Interim

---

[7]    The Committee members are: (i) Ares Special Situations Fund IV, L.P.; (ii) Trunkline Gas Company LLC; (iii) Wilmington Trust, National Association; (iv) Delaware Trust Company, as Indenture Trustee; and (v) U.S. Bank National Association, as Indenture Trustee.

[8]    Due to the voluminous nature of the Debtors' 2014 10-K, the Committee attaches excerpts thereof as Exhibit C hereto. A complete copy of the 10-K is available at http://www.sec.gov/Archives/edgar/data/1060990/00010609901500 0065/kwk10-k12312014.htm.

Order, *see* Interim Order at ¶ 13, the Court noted that all provisions of the Interim Order would be revisited at the final hearing on the Motion.  First-Day Hearing Transcript at 125-26.

## ARGUMENT

8.      Pursuant to section 363(c)(2) of the Bankruptcy Code, a debtor may not use cash collateral unless "(A) each entity that has an interest in such cash collateral consents; or (B) the court, after notice and a hearing, authorizes such use, sale or lease . . . ."  11 U.S.C. § 363(c)(2).  Further, section 363(e) of the Bankruptcy Code provides that a debtor need only adequately protect a secured creditor to the extent of any diminution in value of the secured creditor's collateral resulting from the debtor's use of such collateral during the pendency of the bankruptcy case.  11 U.S.C. § 363(e); *In re First S. Sav. Ass'n*, 820 F.2d 700, 710 (5th Cir. 1987) (stating that the "focus [of adequate protection] is protection of the secured creditor from diminution in the value of its collateral during the reorganization process" (quoting *In re Beker Indus.*, 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986))).

9.      It is well established that a secured party is not entitled to adequate protection absent a showing of the requisite cause.  Specifically, a secured creditor is not entitled to adequate protection unless there is evidence that its collateral is declining in value.  *See, e.g., Zink* v. *Vanmiddlesworth*, 300 B.R. 394, 402-03 (N.D.N.Y. 2003) ("[T]he initial burden of showing the need for adequate protection [is] upon the creditor having an interest in the property being used by the debtor.  In order to meet this burden, the secured creditor must demonstrate that such relief is required by showing a likelihood that the collateral will decrease in value or establishing some other basis for the relief.  The burden then shifts to the debtor to show that adequate protection is not needed or can be provided in a different manner.") (internal citations omitted); *In re Gunnison Ctr. Apartments, L.P.*, 320 B.R. 391, 396 (Bankr. D. Colo. 2005) ("The secured creditor 'must, therefore,

prove this decline in value-or the threat of a decline-in order to establish a *prima facie* case.'"

(quoting *In re Elmira Litho, Inc.*, 174 B.R. 892, 902 (Bankr. S.D.N.Y. 1994))); *In re Cont'l Airlines, Inc.*, 146 B.R. 536, 539 (Bankr. D. Del. 1992) ("Post-*Timbers* courts have uniformly required a movant seeking adequate protection to show a decline in value of its collateral.")

10.    Moreover, adequate protection payments are not meant to improve the position of undersecured creditors in relation to other creditors. *In re Weinstein*, 227 B.R. 284, 297 (B.A.P. 9th Cir. 1998) (noting that "permitting such a bonus would be akin to providing the undersecured creditor with interest or lost opportunity costs which is expressly prohibited by *Timbers*"). Indeed, certain provisions of the Bankruptcy Code "are premised on the equitable principle that the unencumbered assets of a debtor's estate will not be used to benefit one class of creditors at the expense of another class." *United Savs. Ass'n of Texas* v. *Timbers of Inwood Forest Assocs., Ltd. (In re Timbers of Inwood Forest Assocs., Ltd.)*, 793 F.2d 1380, 1387 (5th Cir. 1986), *aff'd*, 484 U.S. 365 (U.S. 1988).

A.    **Prepetition Secured Parties' Adequate Protection Package Is Excessive and Should Not Include the Adequate Protection Payments or Many of the Other Benefits Provided Under the Proposed Final Order**

11.    The Debtors are seeking approval of a robust adequate protection package that includes, among other things, waivers of sections 552(b)'s and 506(c)'s critical unsecured lender protections, monthly postpetition interest payments of approximately $4.8 million to the undersecured Second Lien Parties ***plus*** millions of dollars in professional fees, and liens on unencumbered assets and superpriority claims far beyond that provided for in the Bankruptcy Code. As a preliminary matter, neither the Debtors nor the Prepetition Secured Parties have presented any evidence that the value of the Prepetition Collateral is expected to decrease during these chapter 11 cases. The Court should deny the Debtors' request to provide the Prepetition Secured Parties with the Adequate Protection Payments and many of the other benefits in the proposed Final Order on

that basis alone. *See In re Cont'l Airlines, Inc.*, 146 B.R. at 539. Nevertheless, the Prepetition Secured Parties may argue that the extraction of the Debtors' hydrocarbon assets must necessarily diminish the value of the Prepetition Collateral and, thus, the outsized adequate protection package described in the Motion is justified. *See* Motion at ¶¶ 17-18.

12.    The Prepetition Secured Parties' argument, however, is flawed. In reality, the circumstances of these cases are such that on balance the value of the Prepetition Collateral is actually preserved through operation of the cases and use of the Unencumbered Cash. As described above, the Debtors have substantial unencumbered assets, including, *inter alia*, $167.5 million in Unencumbered Cash as of the Petition Date,[9] a $413 million Intercompany Note, the Unencumbered West Texas Assets, and the Unencumbered Barnett Assets. *See Declaration of Vanessa Gomez Lagatta in Support of First Day Pleadings* [Docket No. 19] (the "First-Day Declaration") at ¶ 28. The Debtors have stressed that they intend to rely on the Unencumbered Cash to fund operations during these chapter 11 cases and without which they could not remain viable as a going concern. *See* First-Day Declaration at ¶ 57 (noting that the Debtors will need to "rely[] on the Unencumbered

---

[9]    All of the Unencumbered Cash was borrowed under the Combined Credit Agreements prior to the Petition Date and was deposited into investment accounts with banks that were not part of the Debtors' credit facilities. *See* First-Day Hearing Transcript at 16. At the first-day hearing, the Ad Hoc Group of Second Lienholders acknowledged that the Prepetition Secured Parties do not have a lien on the depository accounts in which the Unencumbered Cash currently sits. *Id.* at 94. Notwithstanding this acknowledgement, they raised the novel argument—without any legal or factual support—that the Unencumbered Cash is actually part of the Prepetition Collateral because the Prepetition Secured Parties have a lien on "accounts or contract rights from property derived or related to the hydrocarbons," and the draws on the U.S. Credit Facility "clearly relate to the mortgage property rights and the contractual rights governing investments . . . within that grant." *Id.* at 95. However, the plain language of the underlying debt documents is fatal to the Ad Hoc Group of Second Lienholders' bare assertions. The Second Lien Credit Agreement provides that the Second Lien Parties are entitled to liens on "Oil and Gas Properties" representing at least 87.5% of proved reserves. Second Lien Credit Agreement § 8.13(a). *But "Oil and Gas Properties" expressly excludes "cash, deposit accounts . . . commodity accounts . . . or securities accounts." Id.* at § 1.01 (emphasis added). Additionally, while the UCC-1 financing statement filed in connection with the Second Lien Parties' Prepetition Collateral grants a security interest in the Debtors' "Accounts and Contract Rights," such rights are limited to those "derived from *or specifically pertaining to*" (*not merely "related to"*) the Debtors' encumbered assets. The Unencumbered Cash was not "derived from" the Prepetition Collateral—it was merely drawn on the revolver. And there is no evidence demonstrating that the Unencumbered Cash "specifically pertain[s] to" the Prepetition Collateral. Finally, a substantial portion of the borrowings were under the Canadian Credit Agreement, and it is unclear whether the Ad Hoc Group of Second Lienholders' "theory" even applies with respect to these drawings. Accordingly, the Ad Hoc Group of Second Lienholders' arguments fails. Copies of the Second Lien Credit Agreement and the UCC-1 financing statement are attached hereto as Exhibit D and Exhibit E, respectively.

Cash to satisfy payroll, pay suppliers, meet overhead, pay utility expenses, as well as make any other payments which are essential for the continued management, operation and preservation of the Debtors' businesses"); First-Day Hearing Transcript at 82 (stating that to emerge from chapter 11 the Debtors will need to rely on "unencumbered cash that comes from the operation of wells that aren't pledged, and . . . unencumbered cash that's currently residing in our investment accounts").

13.     By contrast, it is unclear whether any "cash collateral" currently exists or whether, after deducting expenses, the Debtors will actually generate any such cash collateral on a postpetition basis.[10] To the extent that any cash collateral is generated after the Petition Date, it will be deployed to develop and operate the Debtors' domestic proved oil and gas properties and related assets, the substantial majority of which constitute Prepetition Collateral. Motion at ¶ 14.[11]

14.     Accordingly, contrary to any "diminution in value" argument the Prepetition Secured Parties may conjure up, the Debtors' use of Unencumbered Cash and operating revenues to satisfy working capital needs in these chapter 11 cases will likely *enhance* the value of the Prepetition Collateral, thus inuring to the benefit of the Prepetition Secured Parties. *See, e.g., In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (holding that secured creditor was

---

[10]    At the first-day hearing, the Debtors refused to stipulate as to the amount of cash collateral that they possessed at that time, though they agreed that the amount of cash collateral was "somewhere between zero and $8 million dollars." First-Day Hearing Transcript at 110.

[11]    The Committee reserves the right to argue that the Prepetition Secured Parties' prepetition liens and security interests do not attach to the Debtors' postpetition operating revenues because, among other reasons, such postpetition revenues will likely result from the addition of estate resources and the Debtors' postpetition efforts. *See, e.g., In re Premier Golf Props., L.P.*, 477 B.R. 767, 776 (B.A.P. 9th Cir. 2012) ("[R]evenue generated by the operation of a debtor's business, post-petition, is not considered proceeds [of a secured creditor's prepetition collateral] if such revenue represents compensation for goods and services rendered by the debtor in its everyday business performance . . . . Revenue generated post-petition solely as a result of a debtor's labor is not subject to a creditor's pre-petition interest."); *In re West Chestnut Realty of Haverford, Inc.*, 173 B.R. 322, 325 (E.D. Pa. 1994) (holding that "tipping fees" generated on a landfill postpetition did not constitute "profits" under section 552(b) of the Bankruptcy Code and, thus, were not subject to a postpetition security interest, because such tipping fees were "generated at least in some degree by incidental services provided by the Debtor"); *In re Package Design & Supply Co.*, 217 B.R. 422, 427 (Bankr. W.D.N.Y. 1998) (stating that there are numerous examples of collateral rolling out from a secured creditor's floating lien after a chapter 11 filing, including "where the lender's lien did not encumber all prepetition assets and the unencumbered assets added significant value to what the lienor is claiming, or where postpetition assets were purchased with cash from equity available to unsecured creditors").

adequately protected because "there [was] no question that the property would be improved by the proposed renovations [funded by the proposed financing] and that an increase in value will result"); *In re 499 W. Warren St. Assocs.*, 142 B.R. 53, 56-58 (Bankr. N.D.N.Y. 1992) (holding that use of rents generated by the property to pay operating expenses adequately protected secured creditor's interests, even though such use "arguably diminishe[d] [the secured creditor's] interest therein," because committing a limited portion of the rents to operate and maintain the property "protect[ed] the underlying value of the collateral from decline . . ."); *In re Salem Plaza Assoc.*, 135 B.R. 753, 758 (Bankr. S.D.N.Y. 1992) (holding that secured lender was adequately protected from debtor's use of cash to pay necessary operating expenses, where such use would "preserve the base that generates the income stream").

15.     As the Debtors recognize, they cannot rely exclusively on cash generated by their encumbered assets to fund ongoing capital and operating expenditures. Motion at ¶ 18. Without the use of the Unencumbered Cash, the value of the Prepetition Secured Parties' collateral would decline precipitously as they would be forced to cut operations and needlessly shut in wells due to inadequate capitalization, which would lead to decreased hydrocarbon production, deficient well maintenance, loss of contractor base, and ultimately lower revenues.

16.     The Prepetition Secured Parties' simplistic assertion that extraction of hydrocarbon assets must *per se* diminish the value of the Prepetition Collateral necessarily must be viewed in light of the only alternative available to continued extraction—shutting in the wells and ceasing extraction. However, shutting in a well brings with it the attendant risk that, should the Debtors or Prepetition Secured Parties later decide to re-open such well, any remaining reserves therein may be unrecoverable because of loss of well pressure and water seepage. Restarting a well after shut-in is often uneconomical due to the significant restart costs and the likelihood that the well will never

return to pre-shut-in production levels. Additionally, shutting in wells requires the payment of shut-in royalties and, in time, relinquishment of the lease if the property no longer produces in "paying quantities." In sum, the Debtors' continued use of the Prepetition Secured Parties' collateral actually protects its value.

17.     Alternatively, the Debtors could—and indeed, intend to—use Unencumbered Cash to continue operations while working to reduce expenses (including lease operating expenses, gathering and transport expenses, and overhead costs) through chapter 11 cost-cutting mechanisms. A reduced overall cost structure would allow the Debtors to potentially generate acceptable returns from the Prepetition Secured Parties' collateral in today's lower natural gas price environment while simultaneously gaining optionality for higher natural gas prices in the future. The ability to generate greater (or in some circumstances any) positive cash flow in turn actually *increases the calculation of proved reserves* and results in an increase in collateral value. Additionally, expenditures on workovers, recompletions, and limited drilling of new wells targeting the highest performing areas all can be value-enhancing to the Prepetition Secured Parties' existing collateral asset base.

18.     Accordingly, under the circumstances, the proposed adequate protection package is particularly egregious and replacement liens on the Prepetition Collateral and superpriority 507(b) claims are more than sufficient to protect the Prepetition Secured Parties. The 507(b) claims here are especially valuable given the hundreds of millions of dollars' worth of Unencumbered Property and the Prepetition Secured Parties' ability to assert superpriority claims ahead of all unsecured and administrative creditors as to such Unencumbered Property. Thus, the Prepetition Secured Parties' 507(b) claims constitute sufficient adequate protection in and of themselves for any diminution in value. Granting the Prepetition Secured Parties *additional* adequate protection in the form of, *inter alia*, the Adequate Protection Payments and waivers of sections 552(b) and 506(c) of the Bankruptcy

Code would result in a windfall to the detriment of the Debtors' unsecured creditors and, thus, should not be countenanced by the Court.

**B.    Debtors Should Not Be Permitted to Waive the "Equities of the Case" Exception Under Section 552(b) of the Bankruptcy Code**

19.    The Debtors' proposed waiver of the section 552(b) "equities of the case" exception is particularly egregious as they seek to use the Unencumbered Cash to fund their postpetition operations (including operation of the mortgaged properties).  Section 552(b) of the Bankruptcy Code permits a court to disregard a postpetition lien on "proceeds, products, offspring, or profits" of collateral based on the "equities of the case."  11 U.S.C. § 552(b).  "The purpose of the equity exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the trustee's/debtor-in-possession's use of other assets of the estate (which normally would go to general creditors) to cause the appreciated value."  *In re Muma Servs.*, 322 B.R. 541, 558-559 (Bankr. D. Del. 2005) (quoting *Delbridge* v. *Prod. Credit Ass'n*, 104 B.R. 824, 826 (E.D. Mich. 1989)).  The "equities of the case" exception is most commonly invoked where unencumbered cash is used to increase the value of the collateral for the benefit of a secured creditor. *See In re Cross Baking Co.*, 818 F.2d 1027, 1033 (1st Cir. 1987); *Toso* v. *Bank of Stockton (In re Toso)*, 2007 WL 7540985, at *13-14 (B.A.P. 9th Cir. Jan. 10, 2007).

20.    Notably, the legislative history to section 552 states that the equities of the case exception "covers the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the fund available for general unsecured creditors[.]"  S. Rep. No. 95-989, at 91 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5877; *see also In re Mullen*, 172 B.R. 473, 479 (Bankr. D. Mass. 1994) ("As demonstrated by the statements on the floor of both branches, Congress was concerned about the situation where the

estate spends money and thereby causes an enhancement in proceeds or rents which improves the position of the secured party.").

21.    Cases like the Debtors' are precisely what Congress envisioned in enacting section 552(b). As explained in the First-Day Declaration, "[t]he Debtors' business model is predicated upon their ability to exploit their hydrocarbon assets, bring them to market and utilize the proceeds in their business operations." First-Day Declaration at ¶ 56. While the Prepetition Secured Parties have a security interest in the hydrocarbons extracted by the Debtors and the proceeds generated thereby, *id.* at ¶ 27, as described above, the Debtors will undoubtedly rely on Unencumbered Cash to extract these hydrocarbons and generate postpetition revenue. Thus, waiving the "equities of the case" exception is particularly inappropriate here.

22.    Courts generally authorize waivers of the "equities of the case" exception only where substantially all of a debtor's assets are encumbered and the debtor relies principally on the secured lender's cash collateral, rather than unencumbered assets, to fund operations. *Cf. In re Muma Servs.*, 322 B.R. at 559 (holding that the "equities of the case" doctrine was inapplicable because "neither the Debtors nor the Trustee invested any unencumbered funds available to the general unsecured creditors to enhance the value of the assets . . . [but] [o]n the contrary, since all assets were the security of the Bank Group, it was only through the use of the Bank Group's cash collateral (and the financing provided by [the DIP lender]) that the estate was able to continue to operate and maintain the value of the assets"). However, where, as here, the Debtors possess substantial Unencumbered Cash that will be used to satisfy their capital requirements for the Prepetition Secured Parties' benefit, allowing the Prepetition Secured Parties to also receive an "equities of the case" waiver would be inequitable and contrary to Congressional intent.

23.     Importantly, the Committee is currently only asking for the ***preservation*** of the "equities of the case" exception.  The Committee believes that nothing in the record currently supports a section 552(b) waiver—to the contrary, the case dynamics suggest that the "equities of the case" exception will be particularly relevant.  Granting a 552(b) waiver at the outset of these chapter 11 proceedings would prejudice unsecured creditors and deprive the Debtors' estates of an important statutory right.  *See In re Metaldyne Corp.*, 2009 WL 2883045, at *6 (Bankr. S.D.N.Y. June 23, 2009) ("[T]he Court, in its discretion, declines to waive prospectively an argument that other parties in interest may make.  If, in the event, the Committee or any other party [in] interest argues that the equities of the case exception should apply to curtail a particular lenders' rights, the Court will consider it.").

**C.  Debtors Should Not Be Permitted to Waive their Right to Surcharge Collateral Under Section 506(c) of the Bankruptcy Code**

24.     The Debtors' proposed waiver of the right to seek a surcharge against the Prepetition Collateral under section 506(c) of the Bankruptcy Code is similarly improper.  Section 506(c) of the Bankruptcy Code permits a debtor to recover the "reasonable, necessary costs and expenses of preserving, or disposing of, [secured property] to the extent of any benefit to the holder of such claim . . . ."  11 U.S.C. § 506(c).  The purpose of section 506(c) is to allow a claimant who "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral . . . to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party," thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant."  *Precision Steel Shearing, Inc.* v. *Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F.3d 321, 325 (3d Cir. 1995).  Section 506(c) "understandably" shifts the costs of preserving or disposing of a secured party's collateral back to the secured party who has benefited from the expenditure, "which costs might otherwise be paid from the

unencumbered assets of the bankruptcy estate." *In re Visual Indus.*, 57 F.3d at 325; *accord In re Codesco, Inc.*, 18 B.R. 225, 230 (Bankr. S.D.N.Y. 1982) ("The underlying rationale for charging a lienholder with the costs and expenses of preserving or disposing of the secured collateral is that the general estate and unsecured creditors should not be required to bear the cost of protecting what is not theirs.").

25.     Courts in this District have uniformly refused to enforce waivers of section 506(c) surcharge rights when a creditors' committee objects to the waiver. *See, e.g.,* Transcript of Hearing at 20-21, *In re Mortgage Lenders Network USA, Inc.*, Case No. 07-10146 (PJW) (Bankr. D. Del. Mar. 27, 2007) [Docket No. 346] ("Well, let me tell you what the law in this Court's been for at least the last five years. If the Committee doesn't agree with the waiver, it doesn't happen."); *see also* Transcript of Hearing at 212, *In re Energy Future Holdings Corp.*, Case No. 14-10979 (CSS) (Bankr. D. Del. June 5, 2014) [Docket No. 3927].

26.     The Debtors acknowledge that they intend to fund operations—and, thus, preserve and enhance the value of the Prepetition Collateral for the benefit of the Prepetition Secured Parties—using primarily Unencumbered Cash. Thus, waiver of the Debtors' surcharge rights forces unsecured creditors alone to bear the costs of preserving the Prepetition Collateral. If, by the end of these chapter 11 cases, the Debtors have completely drained their Unencumbered Cash in an effort to keep their businesses afloat, unsecured creditors must be able to pursue what limited avenues of recovery remain—including surcharge rights under 506(c) and the 552(b) "equities of the case" exception. Accordingly, the Debtors' proposed waiver of surcharge rights under section 506(c), like their proposed waiver of the 552(b) "equities of the case" exception, is an unjustified and particularly egregious part of the Prepetition Secured Parties' excessive adequate protection package and should be stricken from the Final Order.

**D.    Second Lien Parties Are Undersecured and Not Entitled to Interest or Fees Under Section 506(b) of the Bankruptcy Code**

27.    The Adequate Protection Payments are inappropriate here for the additional reason that they violate section 506(b) of the Bankruptcy Code.  Section 506(b) permits oversecured creditors to receive postpetition interest and fees.  *See* 11 U.S.C. § 506(b); *United Sav. Ass'n. of Tex. v. Timbers of Inwood Forest Assoc., Ltd.*, 484 U.S. 365, 382 (1988).  Undersecured creditors, however, do not have the same entitlement.  *Id.*

28.    Market evidence suggests the Second Lien Parties are likely undersecured.  As of April 15, 2015, the Second Lien Notes traded at 56% of par.[12]  That the Second Lien Notes are trading at a substantial discount demonstrates that the value of the Prepetition Collateral is likely insufficient to pay the Second Lien Parties in full (*i.e.*, that they are undersecured).  Accordingly, the Bankruptcy Code forbids payment of the Second Lien Parties' postpetition interest and fees.  Yet, in an effort to escape this prohibition, the Second Lien Parties seek to collect exactly the same interest and fees by calling them "adequate protection."

29.    Neither the Debtors nor the Second Lien Parties have made any attempt to establish a correlation between any actual projected diminution in value of the Second Lien Parties' Prepetition Collateral and the proposed $58.5 million in postpetition interest payments (not including professional fees) over the next 52 weeks.  The reason is simple—the Adequate Protection Payments are clearly designed to compensate the Second Lien Parties for lost interest on their second lien debt and not for any purported diminution in value of their Prepetition Collateral.  In fact, the Debtors have not even attempted to disguise the Adequate Protection Payments as anything other than postpetition interest.  The Interim Order provides that the Second Lien Parties will receive monthly

---

[12]    Attached hereto as Exhibit F is the Bloomberg Finance L.P. (2015) Daily Historical Line Chart for the Second Lien Notes.  The Court can take judicial notice of published prices of financial instruments.  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 264 n.3 (3d Cir. 2005) (taking judicial notice of stock prices); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 245-46 n.61 (S.D.N.Y. 2004) (taking judicial notice of bond prices).

payments of "*post-petition interest, fees and costs*" due (i) under the Second Lien Credit Agreement at "the Adjusted LIBO Rate for the Interest Period (deemed to be one month's duration) in effect for such Borrowing plus the Applicable Margin," and (ii) under the Second Lien Indenture at the "three-month LIBO Rate plus 5.75%." Interim Order ¶ 10(f). These interest rates are *identical* to the rates set forth in the Second Lien Credit Agreement and Second Lien Indenture, respectively. Thus, the Second Lien Parties will continue receiving interest under the debt documents as if the Debtors never filed for chapter 11 relief. The Court should not authorize this end-run around section 506(b).

### E. Definition of "Adequate Protection Obligations" Is Overly Broad

30.     The proposed adequate protection package is overreaching even in the way it defines the adequate protection obligations. The Interim Order provides that the Prepetition Secured Parties are entitled to adequate protection to the extent of the "Adequate Protection Obligations," which is defined as "the aggregate post-petition diminution in value of the Prepetition Collateral, *including without limitation*, any such diminution resulting from the sale, lease or use by the Debtors (or other decline in value) of the Prepetition Collateral and the imposition of the automatic stay pursuant to Bankruptcy Code section 362." Interim Order ¶ 8 (emphasis added). However, the Bankruptcy Code expressly limits adequate protection claims under section 507(b) to claims arising from the imposition of the automatic stay, the use, sale or lease of property under section 363, or the granting of a priming lien in connection with DIP financing. 11 U.S.C. § 507(b); *see also* 4-507 Collier on Bankruptcy ¶ 507.14 ("A creditor is entitled to section 507(b) priority *only to the extent that the claim arose from the stay of action against property under section 362, from the use, sale or lease of property pursuant to section 363*, or from the granting of a lien under section 364(d).") (emphasis added). Accordingly, the expansive definition of "Adequate Protection Obligations," which makes the actual Bankruptcy Code definition *additive* to the broader definition they have crafted, goes far beyond what the Bankruptcy Code allows with respect to the proposed superpriority 507(b) claims

and, at a minimum, the "including without limitation" language should be stricken from the Final Order.

31.     Under section 507(b) of the Bankruptcy Code, "the extent of the creditor's loss cannot always be measured by the decrease in value of the collateral. Rather, it is the extent of the loss *caused by the trustee's use of the collateral*." 4-507 Collier on Bankruptcy ¶ 507.14 (emphasis added). Additionally, a debtor is not required to compensate a secured creditor for the full amount of any loss caused by the automatic stay; instead, "[i]f the collateral were a type less easily liquidated than [for example,] an item of equipment, it would be necessary to analyze whether the creditor would have incurred some or all of the loss even if the asset was returned to the creditor at the time adequate protection was granted. If the security interest covered inventory that could be liquidated only over a considerable period of time at a considerable cost, the extent to which the creditor would have incurred liquidation costs ought to be considered." *Id.*

32.     Given the likely difficulty and expense in foreclosing on potentially thousands of oil and gas leases, these costs must be factored into any 507(b) claim. Similarly, any section 507(b) claims of the Prepetition Secured Parties must take into account all of the pluses and minuses resulting from the Debtors' actual use of the Prepetition Collateral and not be limited to just the value of the hydrocarbon extracted. As such, the definition of "Adequate Protection Obligations" must be limited to that found in the Bankruptcy Code so that the Prepetition Secured Parties are granted 507(b) claims only to the extent that diminution in the value of the Prepetition Collateral is caused by the imposition of the automatic stay or the Debtors' use of such property. *Cf. Baybank-Middlesex* v. *Ralar Distribs.*, 69 F.3d 1200, 1204 (1st Cir. 1995) (holding that the secured creditor was not entitled to a section 507(b) claim because the debtor's use of collateral benefitted the secured creditor). Finally, any section 507(b) claims or liens should not allow the Second Lien

Parties to invade any monies made available to undersecured creditors under sections 552(b) and 506(c).

**F.  Debtors May Not Grant Adequate Protection Liens on the Proceeds of Avoidance Actions**

33.     The Prepetition Secured Parties' adequate protection package also includes adequate protection liens on "any proceeds or property recovered in respect of any Avoidance Action." It is well established, however, that avoidance actions should be preserved for the benefit of unsecured creditors. *See, e.g., Buncher* v. *Official Comm. of Unsecured Creditors of GenFarm Ltd. Partnership IV*, 229 F.3d 245, 250 (3d Cir. 2000) ("The purpose of fraudulent conveyance law is to make available to creditors those assets of the debtor that are rightfully part of the bankruptcy estate, even if they have been transferred away. When recovery is sought under section 544(b) of the Bankruptcy Code, any recovery is for the benefit of all unsecured creditors, including those who individually had no right to avoid the transfer.") (internal citations omitted); *McCarthy* v. *Navistar Fin. Corp. (In re Vogel Van & Storage, Inc.)*, 210 B.R. 27, 33 (N.D.N.Y. 1997) (noting that courts have refused to allow the assignment of avoidance claims because only the trustee or debtor-in-possession, as a representative of all creditors, can sue on an avoidance claim), *aff'd*, 142 F.3d 571 (2d Cir. 1998); *In re Adams*, 275 B.R. 274, 283 (Bankr. N.D. Ill. 2002) ("[T]he grant of a superpriority claim to a pre-petition secured creditor violates the Code's policy of equality of distribution, particularly where there is no showing that such a grant will benefit the debtors' bankruptcy estate.").

34.     Absent exigent circumstances, the proceeds of avoidance actions should not be subject to adequate protection liens and should inure solely to the benefit of unsecured creditors. Although the value of the Unencumbered Property is substantial today, significant risk exists that it will be substantially depleted over the course of these chapter 11 cases for the Prepetition Secured

Parties' benefit. Moreover, as described above, the Prepetition Secured Parties are already adequately protected through the grant of replacement liens and 507(b) claims. Thus, the Debtors should not be permitted to grant adequate protection liens on the proceeds of avoidance actions as such proceeds may prove to be a valuable source of future recovery.

**G.  Committee's Investigation Period Should Be Expanded**

35.    The Interim Order unduly restricts the Committee's ability to investigate the Prepetition Secured Parties' liens and claims by imposing a 60-day challenge period—the bare minimum under the Local Rules. Pursuant to section 1103(c)(2) of the Bankruptcy Code, the Committee is empowered to "investigate the acts, conduct, assets, liabilities, and financial condition of the debtor . . . and any other matter relevant to the formulation of the plan." 11 U.S.C § 1103(c)(2). However, the investigation period proposed by the Debtors is woefully inadequate and prevents the Committee from fulfilling its investigatory duties in this complex case for the benefit of the Debtors' unsecured creditors.

36.    Local Rule 4001-2 provides that, if a request for the use of cash collateral includes "[p]rovisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor," then a creditors' committee must have at least 60 days from the date of formation to investigate such matters. Local Rule 4001-2(a)(i)(B). But in a case of this magnitude, a 60-day investigation period is simply inadequate. More than three weeks have already elapsed since the Committee's appointment; the Committee and its professionals have spent most of that time getting up to speed on case issues (which, given the nature of the Debtors' businesses, involves a substantial learning curve) and working with the Debtors to resolve the Committee's preliminary objections to the Debtors' first-day pleadings.

37.    The Debtors' prepetition secured indebtedness, totaling over $1 billion in the aggregate, involves multiple tranches of debt with complicated security arrangements, not to mention the potential for cross-border issues given the presence of both U.S. and Canadian facilities. The difficulty in analyzing the validity of the Prepetition Secured Parties' liens and claims is magnified given the potential presence of thousands of leases covering various parcels of land in which the Debtors have an interest. And, the nature of the Debtors' businesses gives rise to additional issues unique to the oil and gas sector, such as the imposition and effect of mechanics' and materialmens' liens and "first purchaser" liens under the Uniform Commercial Code. Suffice it to say, the Committee's investigation, if any, regarding the validity of the Prepetition Secured Parties' liens and claims will take substantial effort and time.

38.    Accordingly, the Committee requests that the Final Order be modified to provide that (i) the Challenge Period expires 120 days after appointment of the Committee, without prejudice to the Committee's right to obtain further extensions of the Challenge Period by agreement of the parties or for cause, and (ii) the Committee shall be granted standing now to pursue any and all causes of action that it deems appropriate. Similar challenge periods are frequently approved in this District.[13]

---

[13]    *See, e.g., In re NewPage Corp.*, Case No. 11-12804 (Bankr. D. Del. Oct. 5, 2011) [Docket No. 310] (challenge period expired 120 days after appointment of creditors' committee); *In re AbitibiBowater Inc.*, Case No. 09-11296 (Bankr. D. Del. June 4, 2009) [Docket No. 407] (same); *In re Muzak Holdings LLC*, Case No. 09-10422 (Bankr. D. Del. Mar. 12, 2009) [Docket No. 133] (creditors' committee required to file a standing motion within 105 days after its appointment and challenge period expired 10 days after entry of standing order); *In re Fedders N. Am., Inc.*, Case No. 07-11176 (Bankr. D. Del. Oct. 5, 2007) [Docket No. 272] (challenge period expired 118 days after entry of the final DIP order); *see also In re MPM Silicones, LLC*, Case No. 14-22503 (Bankr. S.D.N.Y. May 23, 2014) [Docket No. 253] (challenge period ended 90 days after entry of final DIP order); *In re Metro Affiliates, Inc.*, Case No. 13-13591 (Bankr. S.D.N.Y. Dec. 4, 2013) [Docket No. 190] (challenge period ended 120 days after entry of final order); *In re Eastman Kodak Co.*, Case No. 12-10202 (Bankr. S.D.N.Y. Feb. 16, 2012) [Docket No. 375] (challenge period ended 180 days after entry of final order).

## H.  First Lien Debt Repayments Using Hedge Proceeds Should Not Be Authorized on a Final Basis

39.    The Debtors have on a postpetition basis applied $46.5 million of hedge termination proceeds to repay low-cost first lien indebtedness outstanding under the U.S. Credit Agreement. Quicksilver Resources Inc., Annual Report (Form 10-K) (Mar. 31, 2015) at 58.  Although the First Lien Repayment was permitted under the Interim Order, *see* Interim Order ¶ 13, the Court stated that all provisions of the Interim Order would be revisited at the final hearing on the Motion.  First-Day Hearing Transcript at 125-26 ("We're here on an interim hearing.  The record is less than perfect as is usually the case and it's very understandable.  But the goal here is to get us to a final cash collateral hearing where all issues can be addressed and with the least amount of damage to the party's positions.").  The Committee believes that the First Lien Repayment was premature given that it transferred substantial cash collateral away from the estates at the outset of these chapter 11 proceedings,[14] which cash might be later determined to be best applied to fund capital and operating expenditures.

40.    At this early stage of the proceedings, where these chapter 11 cases have no clear direction, it would be inequitable for the Court to approve the First Lien Repayment on a final basis. Accordingly, the Committee requests that the Final Order provide that the First Lien Repayment is approved on an interim basis only for six months (subject to the Committee's right to request further extensions upon a motion or agreement of the parties) so that the parties can use that time to obtain a clearer picture of the Debtors' ultimate reorganization strategy.  The Court will then hold a hearing at the end of the six-month period to determine whether to approve the First Lien Repayment on a final basis.

---

[14]    In light of the Committee's recent appointment, its review and analysis of the Prepetition Secured Parties' liens and security interests is ongoing.  Accordingly, the Committee reserves the right to argue that the hedge termination proceeds do not constitute the First Lien Parties' Prepetition Collateral.

## **RESERVATION OF RIGHTS**

41.     The Committee expressly reserves all rights, claims, arguments, defenses, and remedies with respect to the Motion or any other issue in these chapter 11 cases, and to supplement, modify and amend this Objection, to seek discovery, and to raise additional objections in writing or orally at the final hearing on the Motion.

WHEREFORE, for the foregoing reasons, the Committee respectfully requests that this Court

(a) deny the Motion absent the proposed modifications described herein, and (b) grant such other and

further relief as this Court deems just and proper.

Dated: April 20, 2015
      Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Joseph D. Wright (No. 5669)
919 Market Street, Suite 1800
Wilmington, Delaware  19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com
      mcguire@lrclaw.com
      wright@lrclaw.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP**
Andrew N. Rosenberg
Maria T. Vullo
Elizabeth R. McColm
Adam M. Denhoff
Holly A. VanderSluis
1285 Avenue of the Americas
New York, New York 10019
Telephone:  (212) 373-3000
Facsimile:  (212) 757-3990
E-mail:  arosenberg@paulweiss.com
      mvullo@paulweiss.com
      emccolm@paulweiss.com
      adenhoff@paulweiss.com
      hvandersluis@paulweiss.com

*Proposed Counsel to the Official Committee
of Unsecured Creditors*