## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Quicksilver Resources Inc., <u>et al.</u>,[1] | Case No. 15-10585 (LSS) |
| Debtors. | Jointly Administered |
| | **Bid Proc. Hearing: 10/6/15 at 10:00 a.m. (ET)**<br>**Bid Proc. Obj. Deadline: 9/29/15 at 4:00 p.m. (ET)** |

## DEBTORS' MOTION FOR (I) AN ORDER ESTABLISHING BIDDING PROCEDURES AND GRANTING RELATED RELIEF AND (II) AN ORDER OR ORDERS APPROVING THE SALE OF THE ASSETS

The debtors and debtors in possession in the above-captioned chapter 11 cases (collectively, the "Debtors") seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"), (i) approving the proposed bidding procedures attached hereto as **Exhibit B** (the "Bidding Procedures") by which the Debtors will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of their assets (the "Assets") through one or more sales of the Assets (each, a "Sale Transaction" or "Sale"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto;

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are:  Quicksilver Resources Inc. ("Quicksilver") [6163]; Barnett Shale Operating LLC [0257]; Cowtown Drilling, Inc. [8899]; Cowtown Gas Processing L.P. [1404]; Cowtown Pipeline Funding, Inc. [9774]; Cowtown Pipeline L.P. [9769]; Cowtown Pipeline Management, Inc. [9771]; Makarios Resources International Holdings LLC [1765]; Makarios Resources International Inc. [7612]; QPP Holdings LLC [0057]; QPP Parent LLC [8748]; Quicksilver Production Partners GP LLC [2701]; Quicksilver Production Partners LP [9129]; and Silver Stream Pipeline Company LLC [9384].  The Debtors' address is 801 Cherry Street, Suite 3700, Unit 19, Fort Worth, Texas 76102.

(iv) scheduling (a) a hearing (the "Stalking Horse Hearing"), on expedited notice, to approve the Debtors' selection of one or more stalking horse bidders (each a "Stalking Horse Bidder"), if any, and the provision of Bid Protections (as defined below) to such Stalking Horse Bidder, if necessary; (b) an auction (the "Auction") if the Debtors receive two or more timely and acceptable Qualified Bids (as defined below); and (c) a final hearing (the "Sale Hearing") to approve one or more Sales of the Assets; and (v) granting related relief. The Debtors further request that, at the Sale Hearing, this Court enter an order or orders (each, a "Sale Order"), which will be filed before the Sale Hearing, (i) authorizing the sale of the Assets free and clear of liens, claims, interests, and encumbrances (collectively, the "Interests"); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases; and (iii) granting related relief. In support of this motion, the Debtors respectfully state as follows:

## PRELIMINARY STATEMENT

1.    By this motion, the Debtors seek authority to commence a marketing and sale process to sell substantially all or a portion of their Assets. Since the outset of these cases, the Debtors have sought—and continue to seek—the path that maximizes the value of the Debtors' estates for their creditors. That quest must be balanced against the legal parameters of the Bankruptcy Code and the facts of these chapter 11 cases. The Debtors have pursued various restructuring alternatives both before and subsequent to the commencement of these cases and believe that launching a sale process that is designed to maximize purchasers' participation in the Sale while maintaining maximum optionality for the Debtors and their stakeholders is both a valid exercise of the Debtors' business judgment and consistent with their fiduciary obligations to their stakeholders.

2.    As discussed at the hearing before this Court on July 7, and fully set forth in the Debtors' *Motion for Entry of an Order Extending the Exclusive Periods During which Only the*

*Debtors May File a Chapter 11 Plan and Solicit Acceptances Thereof*,[2] the Debtors spent the first 100 days of these cases laying the groundwork to address their numerous balance sheet and operational challenges and achieve a value-maximizing exit from bankruptcy.  At that hearing, the Debtors indicated that they needed to complete several steps integral to establishing such an exit: namely, refining their business plan and furthering negotiations with their stakeholders and key contract counterparties.  Although the Debtors have completed each of these steps, despite their best efforts, the Debtors have not yet obtained sufficient support for a chapter 11 plan that the Debtors believe is confirmable.

3.      As a result, and cognizant of their current monthly cash outlay, which the Debtors estimate will average approximately $8 million per month from the Petition Date through November 30 (the "Monthly Cash Outlay"), continued use of cash collateral, the continuing depletion of their assets through normal operations, and their fiduciary obligation to maximize distributable value for all creditors, the Debtors now seek to launch a sale process that (i) is open to all potential bidders, including third parties and current holders in the Debtors' capital structure; (ii) protects the best interests of the Debtors' estates and creditors; and (iii) preserves the Debtors' right to exercise their fiduciary duties should a value-maximizing alternative materialize, including a plan of reorganization.  This approach is grounded in the Debtors' belief that conducting a fair and robust auction at this time is the most viable alternative to maximize the distributable value of their assets and elicit valuable market feedback for their stakeholders.  Additionally, the Debtors' secured creditors are supportive of the sale process.  For all of the foregoing reasons and those set forth herein, the Debtors believe that launching a marketing and

---

[2] *See* D.I. 430.

RLF1 12987524v.1

sale process pursuant to the Bidding Procedures is a valid exercise of their business judgment, is in the best interests of their estates and creditors, and should be approved.

## JURISDICTION

4.       This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).[3]

5.       Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.       The predicates for the relief requested herein are sections 105, 363, and 365 of title 11 of the United States Code (the "Bankruptcy Code"); rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Local Rules 2002-1 and 6004-1.

## BACKGROUND

A.       **General Background**

7.       On March 17, 2015 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in this Court.  The Debtors continue to operate their business and manage their properties as debtors in possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  These chapter 11 cases have been consolidated for procedural purposes only and are being jointly administered pursuant to Bankruptcy Rule 1015 and Local Rule 1015-1.  No request for the appointment of a trustee or examiner has been made in these chapter 11 cases.  On March 25, 2015, the Acting United States Trustee, Region 3

---

[3] Under rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Debtors hereby confirm their consent to the entry of a final order by this Court in connection with this motion if it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection therewith consistent with Article III of the United States Constitution.

(the "U.S. Trustee") appointed the statutory committee of unsecured creditors (the "Committee") [D.I. 119].

8.       A description of the Debtors and their business is set forth in greater detail in the *Declaration of Vanessa Gomez LaGatta in Support of First Day Pleadings* [D.I. 19] (the "First Day Declaration") filed on the Petition Date and is incorporated herein by reference.

**B.       Specific Background**

*i.    The Debtors' Pre-Petition Marketing and Sales Efforts*

9.       The Debtors commenced these cases, in part, to continue their exploration of restructuring alternatives to address the myriad challenges facing the Debtors.  As this Court is aware, these chapter 11 cases involve fourteen Debtors and $2 billion of consolidated, pre-petition funded debt spread among secured, unsecured, and subordinated debt issuances. Both before and since the Petition Date, Quicksilver and its direct and indirect subsidiaries (the "Company") have thus explored various strategic alternatives to address balance sheet issues and fiscal pressures exacerbated by unpredictable commodity prices.  Notably, in late September 2014, the Company launched a strategic alternatives process led by Houlihan Lokey Capital, Inc. ("Houlihan") to, among other things, sell all of the Assets as well as the assets of Quicksilver's non-Debtor Canadian subsidiaries (collectively, the "Canadian Assets").[4]

10.       The pre-petition strategic alternatives process covered a broad range of potential buyers, in part due to the diversity of the assets owned by the Company.  For example, to sell the Horn River Basin asset in British Columbia—where there exists an export opportunity for certain types of liquefied natural gas—the Company solicited potential buyers in Asia.  Additionally, the pre-petition marketing process was flexible with regard to the structure and timing of transaction

---

[4] The Debtors intend to launch a parallel sale process for the sale of the Canadian Assets contemporaneously with the domestic sale process proposed herein.

proposals to encourage the broadest participation at that time.   Bids in connection with this marketing process were initially due by December 2014, but this deadline was extended to late January.   Notwithstanding this extension, no viable option emerged for asset sales or other strategic alternatives likely to have a material impact on the Company's capital structure and liquidity.   As a result, the Debtors commenced these chapter 11 cases in March.

### ii.   The Debtors' Post-Petition Efforts

11.    Since the Petition Date, the Debtors have undertaken significant efforts to stabilize their operations, satisfy applicable reporting requirements, and lay the foundation for a value-maximizing exit from chapter 11.   Specifically, the Debtors (i) have rejected burdensome contracts;[5] (ii) re-negotiated certain other contracts to accommodate current conditions in the oil and gas market; (iii) clarified their outstanding liabilities following the deadline for filing general proofs of claim; (iv) received authority to use cash collateral on a final basis; (v) implemented a process for tracking post-petition revenue and producing corresponding reports for various stakeholders; (vi) worked with their secured lenders to extend the forbearance period on certain obligations (to at least delay the filing of a companion proceeding under the Companies Creditors' Arrangement Act and maintain optionality with respect to the Canadian Assets); (vii) met with key stakeholders, including the Committee and the Debtors' secured creditors, to address the allocation of certain non-direct expenses and other topics; (viii) extensively cooperated with the Committee's advisors to assist in their complex lien review regarding certain oil and gas assets; and (ix) traced cash collateral and the allocation of well expenses.[6]

12.    While these undertakings represent significant achievements in and of themselves, their import is also in forming the predicate for exit strategy negotiations.   To that end, the

---

[5] *See* D.I. 213 and D.I. 334.
[6] *See* D.I. 417.

Debtors provided a refined business plan to the Committee and secured creditors and, in June, July, and August, held meetings with these creditors to measure parties' support for a consensual plan of reorganization. Recognizing the uncertainty of achieving this result, particularly in view of unpredictable commodity prices and certain issues relating to the Debtors' unencumbered assets and the allocation of expenses among encumbered and unencumbered assets, the Debtors simultaneously refreshed the data from their pre-petition marketing process to prepare for a potential sale. This dual-track contingency planning has proven to be prudent. Indeed, notwithstanding the Debtors' efforts, the Debtors do not believe that sufficient support for a confirmable plan of reorganization exists at this time. This fact, compounded by the Debtors' Monthly Cash Outlay[7] and continued use of cash collateral as well as the depletion of the Debtors' assets through normal operations, has led the Debtors to determine that they can no longer delay in commencing a process to advance these cases toward an exit. As a result, the Debtors have determined to launch a process to sell their Assets and, on a parallel path, pursue a potential sale of the Canadian Assets. This approach represents a sound exercise of the Debtors' business judgment, is consistent with their fiduciary obligation to maximize the recoverable value of their estates, and is in the best interest of the Debtors' estates and creditors.

### iii. The Proposed Sale

13.    The Debtors, in consultation with their advisors, believe that pursuing a Sale Transaction at this time without a Stalking Horse Bidder is the course of action most likely to maximize value and encourage robust bidder participation.[8] Indeed, this approach facilitates the expedited launch of the sale process without the delay attendant to first negotiating a stalking

---

[7] This cash outlay is as a result of, among other things, capital deployment, adequate protection payments and professional fees attendant to these chapter 11 cases.

[8] As discussed below, the Debtors reserve their right to select a Stalking Horse Bidder or Stalking Horse Bidders under the appropriate circumstances in accordance with the Bidding Procedures.

horse agreement, provides flexibility for the sale of all or a portion of the Assets, delivers market feedback that may incentivize certain creditor constituencies to work toward a consensual resolution of these chapter 11 cases, and advances negotiations regarding the same.

14. Accordingly, by this motion, the Debtors seek authority to implement the Bidding Procedures outlined herein so as to efficiently market and solicit offers for the Assets. The Debtors believe that the relief requested herein will bolster the prospects of a value-maximizing exit from chapter 11.

**C. The Proposed Bidding, Notice, and Assumption and Assignment Procedures**

*i. Proposed Timeline for the Sale*

15. The Debtors propose the following timeline for the Sale:[9]

| Deadline | Action |
|---|---|
| November 30, 2015 at 5:00 p.m. (prevailing Eastern Time) | Bid Deadline |
| December 2, 2015 at 4:00 p.m. (prevailing Eastern Time) | Sale Objection Deadline (defined below) |
| December 9, 2015 at 10:00 a.m. (prevailing Central Time) | Auction |
| December 11, 2015 at 12:00 p.m. (prevailing Eastern Time) | Reply Deadline (defined below) |
| December 14, 2015 at 10:00 a.m. (prevailing Eastern Time) | Sale Hearing |

The Debtors submit that this proposed timeline is eminently reasonable, will foster robust participation in the sale process, is consistent with local practice and custom, and will not prejudice any parties in interest.

*ii. The Bidding Procedures*

16. The Bidding Procedures are designed to maximize value for the Debtors' estates, while ensuring an orderly and efficient sale process. The Bidding Procedures describe, among

---

[9] The Debtors, in the exercise of their business judgment, reserve the right to change these sale-related dates to achieve the maximum value for the Assets.

other things, (i) the procedures for interested parties to access due diligence materials, submit bids, and become qualified as a Stalking Horse Bidder or to participate in the Auction; (ii) the time, place, and process of any Auction; (iii) the selection and approval of any ultimately successful bidders; and (iv) the deadlines with respect to the foregoing.  The Debtors believe, with the support of their secured creditors, that the Bidding Procedures provide for a sale process that will maximize the value of their estates and encourage robust participation in the bid process from all potential bidders.  Indeed, as discussed above, moving forward with this process at this time, and in the manner described herein, will support two very important goals: (a) encouraging participation from the widest possible group of bidders for the Debtors' assets; and (b) improving recoveries for the Debtors' various creditor constituencies by, among other things, advancing these cases toward a conclusion, and in turn, ending the Debtors' monthly outlay of cash and the depletion of the Debtors' assets through normal operations.

17.    A summary of the principal terms of the Bidding Procedures, a complete copy of which is attached hereto as **Exhibit B**, including the terms that are required to be highlighted in accordance with Local Rule 6004-1, is as follows:[10]

| | |
|---|---|
| **Assets to Be Sold (p. 1)** | Substantially all or a portion of the Assets either through one sale to a Successful Bidder or multiple sales to multiple Successful Bidders |
| **Access to Diligence Materials (p. 2)** | To receive access to due diligence materials and to participate in the bidding process, an interested party must submit to the Debtors or already be bound by (i) an executed confidentiality agreement in form and substance satisfactory to the Debtors (which, for the avoidance of doubt, may be substantially in the form attached to the Bidding Procedures as Exhibit 2), (ii) evidence demonstrating the party's financial ability to consummate either (x) a sale transaction for the Assets or (y) in the case of a Chapter 11 Plan |

---

[10] The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the terms of the Bidding Procedures shall govern.  Capitalized terms not defined in this table shall have the meaning ascribed to them in the Bidding Procedures.

| | |
|---|---|
| | Bid, a non-taxable recapitalization transaction pursuant to a chapter 11 plan of reorganization (any such transaction whether the type set forth in (x) or (y), an "<u>Alternate Transaction</u>"), and (iii) a statement that such party has a bona fide interest in purchasing all or some of the Assets.<br><br>A party who, in the Debtors' reasonable discretion, satisfies the requirements set forth in the immediately preceding sentence for receiving access to diligence materials shall be a "Diligence Party." As promptly as practicable after the Debtors determine that a party is a Diligence Party, the Debtors will deliver to the Diligence Party access to the Debtors' confidential electronic data room. The Debtors will afford any Diligence Party the time and opportunity to conduct reasonable due diligence before the Bid Deadline. Notwithstanding the foregoing, the Debtors reserve the right to withhold any diligence materials that the Debtors determine are sensitive or otherwise not appropriate for disclosure to a Diligence Party who the Debtors determine is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Diligence Party. The Debtors shall not exclude a party from diligence who has complied with subsections (i) and (ii) of the preceding paragraph, unless they have first consulted with the Consultation Parties regarding such determination. |
| **Qualification of Bidders and Qualified Bids (pp. 3-6)** | To be eligible to participate in the Auction, each offer, solicitation, or proposal (each, a "<u>Bid</u>"), and each party submitting such a Bid (each, a "<u>Bidder</u>") must satisfy each of the conditions set forth below, as determined by the Debtors. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:<br><br>(a)   <u>Good Faith Deposit</u>: Each Bid for all or a portion of the Assets and each Chapter 11 Plan Bid must be accompanied by a deposit (a "<u>Good Faith Deposit</u>") submitted by wire transfer of immediately available funds to an account identified by the Debtors. Each Good Faith Deposit must equal (1) in the case of a Bid for all or a portion of the Assets, the amount of five percent (5%) of the purchase price contained in the Modified Purchase Agreement (as defined below), (2) in the case of a Chapter 11 Plan Bid, the amount of five percent (5%) of the amount of the cash payments contemplated by such Bid, or (3) for any Bid or Chapter 11 Plan Bid, such other amount as the Debtors determine, in consultation with the Consultation Parties; *provided*, *however*, that any party submitting a Bid primarily composed of a credit bid pursuant to Bankruptcy Code section 363(k) shall not be required to submit a Good Faith Deposit.<br><br>(b)   <u>Bids for Portions of the Assets</u>: A Bid may offer to purchase |

10

all or substantially all of the Debtors' Assets or only a portion of the Assets. The Debtors may, in consultation with the Consultation Parties, waive or modify the application of the Qualified Bid conditions in respect of Bids for a portion of the Assets, including, *inter alia*, the amount of the Good Faith Deposit.

(c)   <u>Same or Better Terms</u>:  To the extent a Stalking Horse Bidder is selected, each subsequent Bid for any Assets subject to the Stalking Horse Agreement (alone or combined with Bids for other Assets subject to the Stalking Horse Agreement) must be on terms that, in the Debtors' business judgment, in consultation with the Bid Consultation Parties, are the same or better than the terms of the Stalking Horse Agreement.

(d)   <u>Executed Agreement</u>:  Each Bid (other than a Chapter 11 Plan Bid) must be based on the Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "<u>Modified Purchase Agreement</u>").  A Bid (other than a Chapter 11 Plan Bid) shall also include a copy of the Purchase Agreement marked against the Modified Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price).

A Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "<u>Investment Agreement</u>").  Such Investment Agreement must provide for a fully-committed investment of capital in exchange for substantially all of the equity of the reorganized Debtors in a non-taxable recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization.

(e)   <u>Designation of Assigned Contracts and Leases, Payment of Cure Amounts</u>:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to it at closing and provide for the payment of all cure amounts payable with respect to such contracts and leases under the Bankruptcy Code.

(f)   <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating

appropriate corporate authorization to consummate the proposed Alternate Transaction, *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(g)     Disclosure of Identity of Bidder: A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Assets or otherwise participating in connection with such Bid (including any equity holder or other financial backer if the Bidder is an entity specifically formed for the purpose of effectuating the Alternate Transaction), and the complete terms of any such participation, including any binding agreements, arrangements, or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid.

(h)     Proof of Financial Ability to Perform: A Bid must include written evidence that the Debtors reasonably conclude, in consultation with their advisors and the Bid Consultation Parties, demonstrates that the Bidder has the necessary financial ability to (i) close the Alternate Transaction and (ii) provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia*, the following:

(1)     contact names and numbers for verification of financing sources;

(2)     evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized financial institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid (including, if applicable, the Bidder's payment of cure amounts) or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in such amount, in each case, as are needed to close the Alternate Transaction;

(3)     the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

12

(4)     a description of the Bidder's pro forma capital structure; and

(5)     any such other form of financial disclosure or credit-quality support information or enhancement reasonably requested by the Debtors, in consultation with the Bid Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(i)     <u>Regulatory and Third Party Approvals</u>: A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, if any, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Purchase Agreement or Investment Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible).

(j)     <u>Contingencies</u>:    Each Bid may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(k)     <u>Irrevocable</u>:    Each Bid must expressly provide that (1) the Bidder is prepared to consummate the transaction set forth in the Modified Purchase Agreement promptly following entry of the Sale Order and satisfaction of the closing conditions (if any) set forth in the Modified Purchase Agreement, and (2) the offer reflected in such Bid shall remain open and irrevocable until the conclusion of the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid, such Bid shall continue to remain open and irrevocable as provided under "Closing the Auction; Successful Bidder" and "Backup Bidder" below.

(l)     Purchase Price Allocation: Each Bid must specify the portion of the aggregate purchase price thereunder that is being allocated to each of the Barnett Shale Asset (and, if the Bid is for only a portion of the Barnett Shale Asset, the price being allocated to the Lake Arlington (including Village Creek), Hill County, Cowtown or Alliance assets within the Barnett Shale Asset), the West Texas Asset, and the intercompany note between Quicksilver Resources Inc. and Quicksilver Resources Canada Inc. (the "<u>Intercompany Note</u>").  As used

in the Bidding Procedures, "Barnett Shale Asset" and "West Texas Asset," shall have the meanings given to them in the Form 10-K filed by Quicksilver Resources Inc. with the U.S. Securities and Exchange Commission for the year ended December 31, 2014.

(m)   Bid Deadline:  Each Bid must be received by each of the following parties, in writing, on or before November 30, 2015 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be designated by the Debtors in consultation with the Consultation Parties (the "Bid Deadline"): (1) the Debtors, Quicksilver Resources Inc., 801 Cherry St., Suite 3700, Unit 19, Fort Worth, TX 76102, Attn: Glenn Darden, CEO (gdarden@qrinc.com), Vanessa Gomez LaGatta, CFO (vgomez@qrinc.com), and John Little, SAO (jolittle@deloitte.com); (2) counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, TX 75201, Attn: Sarah Link Schultz, Esq. (sschultz@akingump.com) and Stephen B. Kuhn, Esq. (skuhn@akingump.com); (3) investment banker for the Debtors, Houlihan Lokey, 245 Park Avenue, 20th Floor, New York, NY 10167, Attn: John-Paul Hanson (jhanson@hl.com) and Adam Dunayer (adunayer@hl.com); (4) counsel for the Committee, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew N. Rosenberg, Esq. (arosenberg@paulweiss.com) and Elizabeth McColm, Esq. (emccolm@paulweiss.com); (5) counsel for the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Steven M. Fuhrman, Esq. (sfuhrman@stblaw.com); (6) counsel for the Second Lien Agent (as defined below), Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, NY 10022, Attn: Mitchell A. Seider, Esq. (mitchell.seider@lw.com) and David Hammerman, Esq. (david.hammerman@lw.com); (7) counsel for the Second Lien Indenture Trustee, Emmet, Marvin & Martin LLP, 120 Broadway, 32nd Floor, New York NY 10271, Attn: Edward P. Zujkowski, Esq. (ezujkowski@emmetmarvin.com) and Thomas Pitta, Esq. (tpitta@emmetmarvin.com); and (8) counsel for the Ad Hoc Group of Second Lienholders, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, Attn: Dennis F. Dunne, Esq. (ddunne@milbank.com) and Samuel A. Khalil, Esq. (skhalil@milbank.com).

A Bid received from a Bidder on or before the Bid Deadline that meets the requirements set forth above for the applicable Assets shall constitute a

| | |
|---|---|
| | "Qualified Bid" for such Assets, and such Bidder shall constitute a "Qualified Bidder" for such Assets. |
| **Credit Bidding (p. 9)** | Notwithstanding anything else contained in the Bidding Procedures, the Second Lien Parties shall have the right, subject in all respects to the Bankruptcy Code and other applicable law, to credit bid all or any portion of their allowed secured claims at the Auction pursuant to Bankruptcy Code section 363(k) or other applicable law, in accordance with the applicable provisions of the Second Lien Secured Debt Documents; *provided* that such Bid otherwise complies with these Bidding Procedures, the Intercreditor Agreement and the Bankruptcy Code and subject to the rights of the Committee as set forth in paragraph 8 of the Bidding Procedures Order. |
| **Option to Select Stalking Horse with Bid Protections (p. 7)** | Subject to the provisions set forth in the Bidding Procedures and in consultation with the Consultation Parties, the Debtors reserve the right, at any time before December 1, 2015, to enter into a purchase agreement (the "Stalking Horse Agreement"), subject to higher or otherwise better offers at the Auction, with any Qualified Bidder that submits a Qualified Bid acceptable to the Debtors, in consultation with the Consultation Parties, to establish a minimum Qualified Bid at the Auction. The Stalking Horse Agreement may contain certain customary terms and conditions, including expense reimbursement and a break-up fee in favor of the Stalking Horse Bidder (the "Bid Protections") in amounts to be determined by the Debtors in consultation with the Consultation Parties. To the extent the Debtors enter into a Stalking Horse Agreement, the Debtors shall seek expedited approval of their entry into such agreement and any Bid Protections included therein together with the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder, on no less than seven (7) days' notice. The Debtors shall serve notice of the Stalking Horse Agreement and the Stalking Horse Hearing on all parties on the Debtors' Rule 2002 Notice List, all parties expressing interest in the Assets and all parties holding liens on the Assets (each, a "Stalking Horse Notice"). Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a correct and complete copy of the Stalking Horse Agreement. At least five (5) days prior to the Auction, the Debtors shall distribute complete and correct copies of the Stalking Horse Agreement(s), if any, to each of the other Qualified Bidders. Notwithstanding anything in the Bidding Procedures or in the Bidding Procedures Order to the contrary, all parties in interest shall have the right, at any time before the start of the Stalking Horse Hearing, to object to the designation of a Stalking Horse Bidder, the provision of Bid Protections to such Stalking Horse Bidder and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder.<br><br>Any Stalking Horse Agreement executed by the Debtors and the transactions |

| | |
|---|---|
| | contemplated thereby will be deemed a Qualified Bid for all purposes, and any Stalking Horse Bidder party to a Stalking Horse Agreement executed by the Debtors will be deemed to be Qualified Bidder. |
| **Auction (pp. 8-9)** | If two or more Qualified Bids for the same Assets are received by the Bid Deadline, the Debtors will conduct the Auction to determine the highest or otherwise best Qualified Bid. If less than two Qualified Bids are received by the Bid Deadline with respect to any portion of the Assets, the Debtors shall not conduct the Auction with respect to such Assets. If only one Qualified Bid is received with respect to all or a portion of the Assets, the Debtors may, after consultation with the Consultation Parties, designate such Qualified Bid as a Successful Bid. Only Qualified Bidders may participate in the Auction. |
| | The Auction shall take place on December 9, 2015 at 10:00 a.m. (prevailing Central Time) at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Ave., Suite 4100, Dallas, Texas 75201, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties. The Auction shall be conducted according to the following procedures: |
| | Only the Debtors, the Consultation Parties, the Stalking Horse Bidder(s) (if any), any other Qualified Bidders, and/or other party as the Debtors may determine to include in their discretion, in each case along with their representatives and advisors, shall be entitled to attend the Auction (such attendance to be in person) and only Qualified Bidders will be entitled to make any Overbids (as defined below) at the Auction. |
| | The Debtors and their advisors shall direct and preside over the Auction, which shall be transcribed. Other than as expressly set forth in the Bidding Procedures, the Debtors (in consultation with the Consultation Parties or, to the extent provided in the Bidding Procedures, the Bid Consultation Parties) may conduct the Auction in the manner they determine will result in the highest or otherwise best offer for any of the Assets. The Debtors shall use their best efforts to, at least 24 hours prior to commencement of the Auction, provide the Consultation Parties and each Qualified Bidder participating in the Auction with a copy of the Modified Purchase Agreement associated with the highest or otherwise best Qualified Bid with respect to the Assets for which such Qualified Bidder is bidding, as determined by the Debtors in consultation with the Bid Consultation Parties (such highest or otherwise best Qualified Bid, the "Auction Baseline Bid"). In the event that the Debtors enter into a Stalking Horse Agreement with respect to any Assets, such Stalking Horse Agreement shall be the Auction Baseline Bid with respect to such Assets. At the start of the Auction, the Debtors shall describe the material terms of the Auction Baseline Bid and each Qualified Bidder participating in the Auction must confirm that (a) it has not engaged in any collusion with respect to the bidding or sale of any of the Assets described in the Bidding Procedures, (b) it has reviewed, understands, and accepts the Bidding Procedures, (c) it has consented to the core jurisdiction of the |

| | |
|---|---|
| | Bankruptcy Court (as described more fully below), and (d) its Qualified Bid is a good faith bona fide offer that it intends to consummate if selected as the Successful Bidder. |
| **Terms and Announcement of Overbids (pp. 9-10)** | An "Overbid" is any bid made at the Auction, in accordance with the requirements set forth in the Bidding Procedures, subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:<br><br>(a)    Minimum Overbid Increments:  The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Auction Baseline Bid by an incremental amount that is not less than the sum of (x) $500,000 (the "Minimum Overbid Increment") plus (y) in the event that the Debtors have entered into a Stalking Horse Agreement with respect to the Assets to which the Overbid relates, the aggregate amount of any Bid Protections under such Stalking Horse Agreement, and each successive Overbid shall exceed the then-existing Overbid by an incremental amount that is not less than the Minimum Overbid Increment.  The Debtors reserve the right, in consultation with the Bid Consultation Parties, to announce reductions or increases in the Minimum Overbid Increment at any time during the Auction.   Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include (i) cash and/or noncash consideration, *provided, however,* that the value for such non-cash consideration shall be determined by the Debtors in their reasonable business judgment in consultation with the Bid Consultation Parties, and (ii) in the case of a Bid by the Second Lien Parties, a credit bid of up to the full amount of the such secured creditors' allowed secured claim, subject to the terms of the Intercreditor Agreement and the Bankruptcy Code and subject to the rights of the Committee as set forth in paragraph 8 of the Bidding Procedures Order.<br><br>(b)    Remaining Terms Are the Same as for Qualified Bids: Except as modified in the Bidding Procedures, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Purchase Agreement, Modified Purchase Agreement or Investment Agreement, as the case may be, in connection therewith.  For the avoidance of doubt, any Overbid shall be |

17

irrevocable and shall remain open and binding on the Bidder in accordance with these Bidding Procedures and the conditions for a Qualified Bid.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Bid Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors), as the Debtors, in their reasonable business judgment in consultation with the Bid Consultation Parties, may request, demonstrating such Bidder's ability to consummate the Alternate Transaction proposed by such Overbid.

**Announcement and Consideration of Overbids.**

(a)     <u>Announcement of Overbids</u>:  A Bidder submitting an Overbid at the Auction shall announce at the Auction the material terms of such Overbid, including the total amount and type of consideration offered in such Overbid.

(b)     <u>Consideration of Overbids</u>:  The Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things:   facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their reasonable business judgment in consultation with the Bid Consultation Parties, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount; *provided* that, to the extent the Debtors determine to request that any Qualified Bidder increase the amount of their Good Faith Deposit, the Debtors first shall consult with the Bid Consultation Parties before making such request.

| | |
|---|---|
| **Closing the Auction; Successful Bidder (p. 11)** | The Auction shall continue until there is only one Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the highest or otherwise best Qualified Bid at the Auction.  Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Bid Consultation Parties, as the |

| | |
|---|---|
| | overall highest or otherwise best Qualified Bid (such Bid, the "<u>Successful Bid</u>," and the Bidder submitting such Successful Bid, the "<u>Successful Bidder</u>").  In making this decision, the Debtors shall consider the Bid Assessment Criteria. |
| | The Auction shall close when the Successful Bidder(s) submits fully executed sale and transaction documents or a fully executed Investment Agreement, as applicable, memorializing the terms of the Successful Bid(s). |
| | Promptly following the Debtors' selection of the Successful Bid(s) and the conclusion of the Auction, the Debtors shall announce the Successful Bid(s) and Successful Bidder(s) and shall file with the Bankruptcy Court notice of the Successful Bid(s) and Successful Bidder(s). |
| | The Debtors shall not consider any Bids submitted after the conclusion of the Auction.  The Successful Bidder(s) shall be required to keep the Successful Bid(s) open and irrevocable until the closing of the transactions contemplated thereby. |
| **Closing with Alternative Backup Bidders (p. 12)** | Notwithstanding anything in the Bidding Procedures to the contrary, the Qualified Bid for the Assets that the Debtors determine in their reasonable business judgment, in consultation with the Bid Consultation Parties, is the next highest or otherwise best Qualified Bid at the Auction after the Successful Bid, will be designated as the "<u>Backup Bid</u>" and the Bidder submitting such Backup Bid, the "<u>Backup Bidder</u>."  The Backup Bidder shall be required to keep the Backup Bid open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is eighty (80) days after the date of entry of the Sale Order (the "<u>Outside Backup Date</u>") or the closing of the transaction with the Successful Bidder (defined herein). |
| | Following entry of the Sale Order, if the Successful Bidder fails to consummate the Successful Bid, the Debtors may, in consultation with the Bid Consultation Parties, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.  In such case of a breach or failure to perform on the part of the Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors.  The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures. |
| **Modification of Bidding and Auction Procedures (pp. 10 -11)** | The Debtors (in consultation with the Consultation Parties), in the exercise of their fiduciary duties for the purpose of maximizing value for their estates from the sale process, may modify the Bidding Procedures and implement additional procedural rules for conducting the Auction.  Specifically, among other things, the Debtors, in consultation with the Bid Consultation Parties, may determine to select more than one Successful Bid and more than one |

| | Successful Bidder (and/or more than one Backup Bid and more than one Backup Bidder, in which event such Backup Bids may provide for groupings of Assets that are different from the groupings of Assets reflected in the Successful Bid(s)) for separate portions of the Assets. |
| --- | --- |

### iii. Reservation of Rights Regarding Potential Stalking Horse Bidder(s) and Form of Purchase Agreement

18.     As discussed above, the Debtors have determined, in a reasonable exercise of their business judgment, that seeking the relief requested herein and commencing a sale process without entering into a Stalking Horse Agreement is warranted and necessary.  The Debtors are continuing their discussions with potential purchasers and, in accordance with the Bidding Procedures, may enter into a purchase agreement with any Stalking Horse Bidder acceptable to the Debtors (the "Stalking Horse Agreement") at any time before December 1, 2015, to establish a minimum Qualified Bid at, and subject to higher or otherwise better offers during, the Auction.

19.     To facilitate a competitive, value-maximizing Sale Transaction, the Debtors are requesting authority, in the exercise of their business judgment and in accordance with the Bidding Procedures, to offer any Stalking Horse Bidder: (i) a break-up fee (the "Break-Up Fee"); (ii) reimbursement of the Stalking Horse Bidder's reasonable fees and expenses (the "Expense Reimbursement"); and/or (iii) initial overbid protection (the "Minimum Overbid Increment" and, together with the Break-Up Fee and the Expense Reimbursement, the "Bid Protections").

20.     In lieu of a Stalking Horse Agreement at this time, the Debtors have prepared a form of Purchase Agreement, which the Debtors (i) intend to file on the docket at least fourteen (14) days before the hearing regarding this motion and (ii) will distribute to all parties who designate their interest in bidding on the Assets.  As set forth in the Bidding Procedures, each Bid (other than a Chapter 11 Plan Bid) must be based on the Purchase Agreement and must include a markup showing any changes to the form of Purchase Agreement.

**D.     Notice Procedures**

21.     The Debtors propose the following notice procedures to be implemented in connection with the sale process.

*i.     Notice of Sale, Auction, and Sale Hearing*

22.     Within seven (7) days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter (the "Mailing Date"), the Debtors shall serve a sale notice, substantially in the form attached hereto as **Exhibit C** (the "Sale Notice"), the Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon (i) all entities reasonably known to have expressed an interest in a transaction with respect to all or part of the Assets within the past two years; (ii) all entities known to have asserted any lien, claim, interest, or encumbrance in or upon any of the Assets; (iii) counsel for the Committee; (iv) counsel for the First Lien Agent; (v) counsel for the Second Lien Agent; (vi) counsel for the Second Lien Indenture Trustee; (vii) counsel for the Ad Hoc Group of Second Lienholders; and (viii) the U.S. Trustee; *provided, however*, that to the extent email addresses are available, parties in the forgoing section 22(i) may be served by email.

23.     In addition, within seven (7) days after the entry of the Bidding Procedures Order or as soon as reasonably practicable thereafter, the Debtors shall serve the Sale Notice by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (i) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief granted herein; (ii) the United States Attorney's offices for the District of Delaware and the Northern District of Texas; (iii) the SEC; (iv) the Internal Revenue Service; (v) all parties entitled to notice pursuant to Local Rule 2002-1(b); (vi) all known creditors of the Debtors, including their contract counterparties;

and (vii) all registered holders of equity securities in Quicksilver.  The Debtors request that such notice be deemed sufficient and proper notice of the Sale Transaction with respect to known interested parties.

24.     Notice by mail to all parties potentially interested in purchasing the Debtors' Assets or participating in the Auction is impracticable.  As a result, the Debtors have determined that it is in the best interest of their estates to also provide notice by publication.  Pursuant to Bankruptcy Rules 2002 and 6004, the Debtors propose to publish the Sale Notice in a form substantially similar to the notice attached hereto as **Exhibit D**, in the *New York Times*, the *Ft. Worth Star Telegram*, and *Platts Gas Daily* on one occasion on the Mailing Date or as soon as reasonably practicable thereafter.  In addition, the Debtors (i) respectfully request the authority, but not the direction, to publish the Sale Notice in additional publications as the Debtors deem appropriate and (ii) will cause the Sale Notice to be posted on their case information website at http://cases.gcginc.com/kwk.

### *ii.  Notice of Stalking Horse Hearing*

25.     To the extent the Debtors enter into a Stalking Horse Agreement, the Debtors shall seek expedited approval of their entry into such agreement, any Bid Protections included therein and the terms and conditions under which such Bid Protections would be payable to the Stalking Horse Bidder, on no less than seven (7) days' notice.  The Debtors shall serve a Stalking Horse Notice on all parties that have requested notice in these chapter 11 cases pursuant to Bankruptcy Rule 2002 (the "Rule 2002 Notice List"), all parties expressing interest in the Assets, and all parties holding liens on the Assets.  Each Stalking Horse Notice will include (i) the identity of the proposed Stalking Horse Bidder, (ii) a summary of the key terms of the Stalking Horse Agreement, (iii) a summary of the type and amount of Bid Protections, if any, proposed to be afforded to the Stalking Horse Bidder, and (iv) a copy of the Stalking Horse Agreement.

*iii. Date, Time, Place, and Notice of Auction*

26.    The Auction, if any, shall take place on December 9, 2015 at 10:00 a.m. (prevailing Central Time) at the offices of counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Ave., Suite 4100, Dallas, Texas 75201, or such other place and time as the Debtors shall notify all Qualified Bidders and the Consultation Parties.

*iv. Notice of Successful Bidder*

27.    As soon as reasonably practicable after the conclusion of the Auction, the Debtors shall file on the docket, but not serve, a notice identifying any Successful Bidder(s) (the "Post-Auction Notice"), substantially in the form attached hereto as **Exhibit E**.

*v. Date, Time, and Place of Sale Hearing*

28.    The Sale Hearing shall be conducted by the Bankruptcy Court on **December 14, 2015 at 10:00 a.m. (prevailing Eastern Time)** or such other date as the Court is available and may, in accordance with the Bidding Procedures Order, be adjourned or rescheduled without notice.  At the Sale Hearing, the Debtors will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid (if any).  Unless the Bankruptcy Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Sale Transaction and there will be no further bidding at the Sale Hearing.  In the event that the Successful Bidder cannot or refuses to consummate the Sale because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Debtors shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.

*vi. Objection Deadline*

29.    Any and all objections, if any, to any Sale Transaction (a "Sale Objection"), must be filed by **December 2, 2015 at 4:00 p.m. (prevailing Eastern Time)** (the "Sale Objection

Deadline") and served on (i) the Debtors, Quicksilver Resources Inc., 801 Cherry St., Suite 3700, Unit 19, Fort Worth, TX 76102, Attn: Vanessa Gomez LaGatta, CFO; (ii) co-counsel for the Debtors, Akin Gump Strauss Hauer & Feld LLP, 1700 Pacific Avenue, Suite 4100, Dallas, TX 75201, Attn: Sarah Link Schultz, Esq. and Ashleigh L. Blaylock, Esq.; (iii) co-counsel for the Debtors, Richards, Layton & Finger, P.A., One Rodney Square, 920 North King Street, Wilmington, DE 19801, Attn: Paul N. Heath, Esq. and Amanda R. Steele, Esq.; (iv) co-counsel for the Committee, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew N. Rosenberg, Esq. and Elizabeth McColm, Esq.; (v) co-counsel for the Committee, Landis Rath & Cobb LLP, 919 Market Street, Suite 1800, Wilmington, DE 19801, Attn: Richard S. Cobb, Esq. and Matthew McGuire, Esq.; (vi) counsel for the First Lien Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Steven M. Fuhrman, Esq.; (vii) counsel for the Second Lien Agent, Latham & Watkins LLP, 885 Third Avenue, Suite 1000, New York, NY 10022, Attn: Mitchell A. Seider, Esq. and David Hammerman, Esq.; (viii) counsel for the Second Lien Indenture Trustee, Emmet, Marvin & Martin LLP, 120 Broadway, 32nd Floor, New York, NY 10271, Attn: Edward P. Zujkowski, Esq. and Thomas Pitta, Esq.; (ix) counsel for the Ad Hoc Group of Second Lienholders, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, Attn: Dennis F. Dunne, Esq. and Samuel A. Khalil, Esq.; (x) the U.S. Trustee, 844 King Street, Suite 2207, Wilmington, DE 19801, Attn. Jane Leamy, Esq.; (xi) if applicable, counsel to any Stalking Horse Bidder(s); (xii) all parties that have requested notice in these chapter 11 cases (collectively (i)-(xii), the "Objection Recipients"); and (xiii) counsel to any Successful Bidder(s), if known on the Sale Objection Deadline.

30.     All replies to any Sale Objection or Designated Contract Objection (as defined below) must be filed by **December 11**, **2015 at 12:00 p.m.  (prevailing Eastern Time)** (the "Reply Deadline").

31.     Any party failing to timely file an objection to any Sale Transaction will be forever barred from objecting and will be deemed to have consented to any Sale Transaction, including the transfer of the Debtors' right, title and interest in, to, and under the Debtors' Assets free and clear of any and all liens, claims, encumbrances and other interests in accordance with a definitive agreement for any Sale Transaction.

**E.      Assumption and Assignment Procedures**

32.     The Debtors propose the procedures set forth below for notifying counterparties to executory contracts and unexpired leases of proposed cure amounts in the event the Debtors decide to assume and assign such contracts or leases.

*i.    Notice of Assumption and Assignment*

33.     On or before November 16, 2015, (any such date, the "Assumption and Assignment Service Date") the Debtors shall file with the Court, and post on the website maintained for these chapter 11 cases at http://cases.gcginc.com/kwk/ (the "Case Website"), a notice of assumption and assignment, substantially in the form attached hereto as **Exhibit F** (the "Notice of Assumption and Assignment") and, included therewith, a list (the "Designated Contracts List") that specifies (i) each of the Debtors' executory contracts and unexpired leases (the "Designated Contracts") and (ii) the proposed amount necessary, if any, to cure all monetary defaults, if any, under each Designated Contract (the "Cure Costs").  If no Cure Cost is listed on the Designated Contracts List, the Debtors believe that there is no Cure Cost, as of the date of such notice.  The Debtors shall serve, via first class mail, a customized version of the Notice of Assumption and Assignment, without the Designated Contracts List, which will include

25

(a) instructions regarding how to view that list on the Case Website (the "DCL Instructions"), (b) information necessary and appropriate to provide notice of the relevant proposed assumption and assignment of Designated Contract(s) and rights thereunder, (c) Cure Costs, if any, and (d) the procedures for objecting thereto ((b)-(d) collectively, the "Necessary Notice Information") on all counterparties to the Designated Contracts.  The Debtors shall serve, via first class mail, a modified version of the Notice of Assumption and Assignment that contains the DCL Instructions and Necessary Notice Information on the Rule 2002 Notice List.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

34.    A counterparty to a Designated Contract listed on the Notice of Assumption and Assignment may file an objection (a "Designated Contract Objection") only if such objection is to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.  All Designated Contract Objections must (i) state, with specificity, the legal and factual basis for the objection as well as what Cure Costs are required, if any, (ii) include appropriate documentation in support thereof, and (iii) be filed and served on the Objection Recipients no later than 4:00 p.m. (prevailing Eastern Time) fourteen (14) days following the Assumption and Assignment Service Date (the "Assumption and Assignment Objection Deadline").

35.    If a counterparty to a Designated Contract files a Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, such later hearing date that the Debtors determine in their discretion, or such other date determined by this Court.

26

*ii.  Supplemental Notice of Assumption and Assignment*

36.    Although the Debtors intend to make a good-faith effort to identify all Designated Contracts that may be assumed and assigned in connection with a Sale Transaction, the Debtors may discover certain contracts inadvertently omitted from the Designated Contracts list or Successful Bidder(s) may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with the Sale.  Accordingly, the Debtors reserve the right, at any time after the Assumption and Assignment Service Date and before the closing of a Sale Transaction, to (i) supplement the list of Designated Contracts on the Notice of Assumption and Assignment with previously omitted Designated Contracts in accordance with the definitive agreement for a Sale Transaction, (ii) remove a Designated Contract from the list of contracts ultimately selected as a Designated Contract that a Successful Bidder proposes be assumed and assigned to it in connection with a Sale Transaction, and/or (iii) modify the previously stated Cure Cost associated with any Designated Contract.

37.    In the event that the Debtors exercise any of the rights reserved above, the Debtors will promptly serve a supplemental notice of assumption and assignment (a "Supplemental Notice of Assumption and Assignment").  The Supplemental Notice of Assumption and Assignment will be served by electronic transmission, hand delivery, or overnight mail on the counterparty (and its attorney, if known) to each impacted Designated Contract at the last known address available to the Debtors.  Each Supplemental Notice of Assumption and Assignment will include the same information with respect to listed Designated Contracts as was included in the Notice of Assumption and Assignment.

38.    Any counterparty to a Designated Contract listed on a Supplemental Notice of Assumption and Assignment may file an objection (a "Supplemental Designated Contract Objection").  A Supplemental Designated Contract Objection may be filed only if such objection

RLF1 12987524v.1

is to the proposed assumption and assignment of the applicable Designated Contract or the proposed Cure Costs, if any.  All Supplemental Designated Contract Objections must (i) state, with specificity, the legal and factual basis thereof as well as what Cure Costs the objecting party believes are required, if any, (ii) include appropriate documentation in support of the objection, and (iii) be filed and served on the Objection Recipients no later than fourteen days from the date of service of such Supplemental Notice of Assumption and Assignment, which date will be set forth in the Supplemental Notice of Assumption and Assignment.

39.    If a counterparty to a Designated Contract files a Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute, the Debtors will seek an expedited hearing before the Court (a "Supplemental Designated Contract Hearing") to determine the Cure Costs, if any, and approve the assumption of the relevant Designated Contracts.  If there is no such objection, then the Debtors will obtain an order of this Court, including by filing a certification of no objection, (a "Supplemental Designated Contract Order") fixing the Cure Costs and approving the assumption of any Designated Contract listed on a Supplemental Notice of Assumption and Assignment.

*iii. Additional Procedures*

40.    If the counterparty to a Designated Contract does not file and serve a Designated Contract Objection or Supplemental Designated Contract Objection in a manner that is consistent with the requirements set forth above, such counterparty will be deemed to have consented to the assumption and assignment of the Designated Contract to a Successful Bidder as an Acquired Contract (as defined below), notwithstanding any anti-alienation provision or other restriction on assumption or assignment in the Designated Contract, and shall be forever barred from asserting

28

any objection with regard to such assumption and assignment, except with respect to the adequate assurance of future performance by such Successful Bidder.

41.    Any objections to a Successful Bidder's proposed form of adequate assurance of future performance must be raised at the Sale Hearing or Supplemental Designated Contract Hearing, as applicable, and will be resolved at the hearing at which it is raised or, in the Debtors' discretion, adjourned to a later hearing.

42.    Absent the filing of a Designated Contract Objection or Supplemental Designated Contract Objection and a subsequent order of the Court establishing an alternative Cure Cost, (i) the Cure Costs, if any, set forth in the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) shall be controlling, notwithstanding anything to the contrary in any Designated Contract or any other document, and (ii) the counterparty to the Designated Contract will be deemed to have consented to the assumption, assignment, and sale of the Designated Contract and the Cure Costs, if any, and will be forever barred from asserting any other claims related to such Designated Contract against the Debtors or the applicable Successful Bidder, or the property of any of them.

43.    The inclusion of a Designated Contract on the Notice of Assumption and Assignment (or Supplemental Notice of Assumption and Assignment) will not (a) obligate the Debtors to assume any Designated Contract listed thereon or the Successful Bidder(s) to take assignment of such Designated Contract or (b) constitute any admission or agreement of the Debtors that such Designated Contract is an executory contract.   Only those Designated Contracts that are included on a schedule of assumed and Acquired Contracts attached to the final Purchase Agreement with the Successful Bidder(s) (each, an "Acquired Contract") will be assumed and assigned to the Successful Bidder(s).

## RELIEF REQUESTED

44.    By this motion, the Debtors request entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Bidding Procedures for soliciting bids; (ii) the Assumption and Assignment Procedures; (iii) the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto;[11] (iv) the scheduling of the Stalking Horse Hearing (if any), the Auction (if any), and the Sale Hearing; and (v) granting related relief.  At the Sale Hearing, the Debtors will also request entry of the Sale Order (or Sale Orders) that will approve the Sale Transaction or Sale Transactions.

## SUPPORTING AUTHORITY

45.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate."  11 U.S.C. § 363(b)(1).  Courts in this Circuit and others, in applying this section, have required that the sale of a debtor's assets be based upon the sound business judgment of the debtor. *See, e.g., Dai-Ichi Kangyo Bank, Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.)*, 242 B.R. 147 (Bankr. D. Del. 1999) (holding that an asset sale may be authorized under Bankruptcy Code section 363 if the court finds a "sound business purpose" for the sale) (citing *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983))*; see also Official Comm. of Unsecured Creditors v. LTV Corp. (In re Chateaugay Corp.)*, 973 F.2d 141, 143 (2d Cir. 1992) (holding that a judge reviewing a section 363(b) application must find from the evidence presented a good business reason to grant such application).

---

[11] To the extent that any of the deadlines set forth in this motion do not comply with the Local Rules, the Debtors hereby request a waiver of any such Local Rule.

46.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" *Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb*, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting *Grobow v. Perot*, 539 A.2d 180, 187 (Del. 1988) *overruled on other grounds*, *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000)); *see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford*, 554 F. Supp.2d 538, 555 n.111 (D. Del. 2008) (same). Thus, this Court should grant the relief requested in this motion if the Debtors demonstrate a sound business justification therefor.  *See In re Del. & Hudson Ry. Co*., 124 B.R. 169, 179 (D. Del. 1991).

47.     The Debtors have sound business justifications for selling the Assets at this time. The Debtors are committed to acquitting their fiduciary obligation to maximize distributable value for their creditors through realignment of their operating cost structure and implementing a process to advance these cases to an expedient, successful exit from chapter 11.  The Debtors commenced these chapter 11 cases to adjust their capital and operational structure for the current commodity price environment.   Volatile commodity prices have compressed value and acceptable levels of debt and rendered the Debtors' capital structure unsustainable and continue to complicate the Debtors' restructuring efforts.  Although the Debtors believe that a consensual reorganization plan would provide for the most value-maximizing outcome of these cases, they are constrained by the requirements for confirmation of such a plan and the facts of these cases. Despite the Debtors' best efforts, the Debtors do not believe that sufficient support for a confirmable chapter 11 plan of reorganization exists at this time.

48.     As a result, and cognizant of their current Monthly Cash Outlay, continued use of cash collateral, the continuing depletion of their assets through normal operations, and their fiduciary obligation to maximize distributable value for all creditors, the Debtors now seek to launch a sale process that is calculated to foster the broadest possible participation by potential bidders while preserving the Debtors' right to exercise their fiduciary duties should a value-maximizing alternative materialize, including a plan of reorganization.  This approach is grounded in the Debtors' belief that commencing a fair and robust sale and auction process at this time may maximize the distributable value of their estates and elicit valuable market feedback for their stakeholders.  Additionally, the Debtors' secured creditors are supportive of the sale process.

49.     Accordingly, the Debtors submit that the Bidding Procedures are designed to maximize the value of the Assets and that the sale of the Assets to a Successful Bidder (or Successful Bidders), is in the Debtors' best interests and should be approved.

**A.      The Bidding Procedures Are Fair, Designed To Maximize The Value Received For The Acquired Assets and Are Consistent with the Debtors' Reasonable Business Judgment.**

50.     The Bidding Procedures are consistent with the Debtors' reasonable business judgment and should be approved.  Courts have made clear that a debtor's business judgment is entitled to substantial deference.  *See, e.g.*, *Stanizale v. Nachtomi (In re Tower Air, Inc.)*, 416 F.3d 229, 234 (3d Cir. 2005)  (indicating the "business judgment rule creates a presumption that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest" (quotations omitted)).  To that end, courts recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and therefore are appropriate in the context of bankruptcy sales.  *See, e.g.*, *Official Comm. of*

RLF1 12987524v.1

*Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993) (noting that such procedures "encourage bidding and to maximize the value of the debtor's assets"); *see also In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. June 25, 2015) [D.I. 539].

51.     The Debtors believe that the Bidding Procedures are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process is fair and reasonable and will yield the maximum value for their estates and creditors.   The currently proposed Bidding Procedures will establish parameters pursuant to which the value of the Assets may be fully tested at the Auction and ensuing Sale Hearing.   Such procedures will increase the likelihood that the Debtors receive the greatest possible consideration for the Assets because they will ensure a competitive and fair bidding process that will encourage participation by financially capable bidders who demonstrate the ability to close such a transaction.   Indeed, the Debtors have put limited (if any) constraints on the ability of prospective purchasers to bid on the Assets, and instead have encouraged bid flexibility by, *inter alia*, allowing the Debtors to consider all competing offers—including offers for all or some Assets and offers in the form of a Chapter 11 Plan Bid—and to select, in their reasonable business judgment, and after consultation with the Consultation Parties (as defined in the Bidding Procedures), the highest or otherwise best offer for the Assets.   The Bidding Procedures also provide potential bidders with sufficient notice and an opportunity to acquire information necessary to submit a timely and informed bid.   Further, the Debtors have instituted mechanisms to ensure an open and robust bidding process at the Auction.

52.     The Bidding Procedures are also consistent with the precedent in this District. *See, e.g.*, *In re Endeavour Operating Corp.*, No. 14-12308 (KJC) (Bankr. D. Del. May 20, 2015)

[D.I. 668]; *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (May

6, 2015) [D.I. 120]; *In re Caché Inc.,* No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I.

196]; *In re RS Legacy Corp. (f/k/a RadioShack Corp.)*, No. 15-10197 (BLS) (Bankr. D. Del. Feb.

20, 2015) [D.I. 457]; *In re Dendreon Corp.,* No. 14-12515 (PJW) (Bankr. D. Del. Dec. 17, 2014)

[D.I. 195]; *In re PSL – N. Am.  LLC*, No. 14-11477 (PJW) (Bankr. D. Del. July 14, 2014) [D.I.

97]; *In re Phoenix Payment Sys., Inc.,* No. 14-11848 (MFW) (Bankr. D. Del. Aug. 26, 2014)

[D.I. 95].

53.     Accordingly, for all of the foregoing reasons, the Debtors believe that the Bidding

Procedures (i) will encourage robust bidding for the Assets, (ii) are consistent with other

procedures previously approved by courts in this District and (iii) are appropriate under the

relevant standards governing auction proceedings and bidding incentives in bankruptcy

proceedings and should be approved.

**B.      Bid Protections May Be Necessary to Preserve the Value of the Debtors' Estates.**

54.     By this motion, the Debtors reserve the right to enter into a Stalking Horse

Agreement, as an exercise of their business judgment and in accordance with the Bidding

Procedures, and to offer Bid Protections in connection therewith.  Specifically, the Debtors may

offer any Stalking Horse Bidder some or all of the following Bid Protections: (i) a Break-Up Fee;

(ii) an Expense Reimbursement; and/or (iii) an Minimum Overbid Increment.   Any Bid

Protections afforded to a Stalking Horse Bidder shall be subject to further approval of this Court

on no less than seven (7) days' notice.

55.     Approval of these forms of Bid Protections in connection with the sale of

significant assets pursuant to Bankruptcy Code section 363 has become established practice in

chapter 11 cases.  *See, e.g., Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl.*

*Energy, Inc.)*, 181 F.3d 527 (3d Cir. 1999); *Integrated Res., Inc.*, 147 B.R. at 656-57 (noting that

overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business judgment" standard, under which such procedures and arrangements are "presumptively valid"); *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (holding that the business judgment standard protects break-up fees and other contractual provisions negotiated in good faith).  The United States Court of Appeals for the Third Circuit has approved bidding incentives in the bankruptcy context.  *In re O'Brien*, 181 F.3d 527; *see also Reliant Energy Channelview LP v. Kelson Channelview LLC (In re Reliant Energy Channelview LP)*, 594 F.3d 200, 206–08 (3d Cir. 2010). The court in *O'Brien* held that even though bidding incentives are measured against a business judgment standard in non-bankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context.  Accordingly, to be approved, bidding incentives must provide some post-petition benefit to the debtor's estate.  *See In re O'Brien*, 188 F.3d at 533.

56.     The Debtors believe that the Bid Protections increase the likelihood of a sale to a contractually committed bidder at a price the Debtors believe is fair, while providing the Debtors with an opportunity to enhance the value to their estate through an auction process.  Without the Bid Protections, a Stalking Horse Bidder may not be willing to enter into a Purchase Agreement. The Bid Protections will be negotiated in good faith.  Further, the amount of the Bid Protections will be reasonable and appropriate in light of the size and nature of the Sale Transaction and the efforts that likely will be expended by a Stalking Horse Bidder.  Payment of the Bid Protections also will not diminish the value of Debtors' estates, as the Debtors do not intend to terminate the Purchase Agreement and pay the Bid Protections, unless doing so would permit the Debtors to accept a better Bid.

RLF1 12987524v.1

57.     This Court has approved protections similar to the proposed Bid Protections as reasonable and consistent with the type and range of Bid Protections typically approved.  *See, e.g.*, *In re Cal Dive Int'l, Inc.*, No. 15-10458 (CSS) (Bankr. D. Del. July 7, 2015) [D.I. 572] (authorizing expense reimbursement); *In re Old FOH Inc. (f/k/a/ Frederick's of Hollywood, Inc.)*, No. 15-10836 (KG) (May 6, 2015) [D.I. 120] (authorizing a termination fee and expense reimbursement); *In re Caché Inc.,* No. 15-10172 (MFW) (Bankr. D. Del. Feb. 25, 2015) [D.I. 196] (authorizing expense reimbursement and break-up fee); *In re Deb Stores Holding LLC*, No. 14-12676 (KG) (Bankr. D. Del. Dec. 18, 2014) [D.I. 159] (same); *In re Source Home Entm't, LLC,* No. 14-11553 (KG) (Bankr. D. Del. July 1, 2014) [D.I. 160] (authorizing expense reimbursement); *In re Coldwater Creek, Inc.,* No. 14-10867 (BLS) (Bankr. D. Del. Apr. 29, 2014) [D.I. 266] (approving expense reimbursement and break-up fee); *In re Brookstone Holdings Corp.,* No. 14-10752 (BLS) (Bankr. D. Del. Apr. 25, 2014) [D.I. 241] (same); *In re LMI Legacy Holdings* Inc. *fdba Landauer Healthcare Holdings,* No. 13-12098 (CSS) (Bankr. D. Del. Sept. 12, 2013) [D.I. 143] (same).

## C.     Approval of the Sale Is Warranted under Bankruptcy Code Section 363(b).

58.     As set forth above, a debtor may be authorized to sell assets out of the ordinary course of business pursuant to Bankruptcy Code section 363 and before obtaining a confirmed plan of reorganization when it demonstrates a sound business purpose for doing so.  *See In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the "sound business judgment test" of *Lionel*); *In re Dura Auto. Sys., Inc.*, No. 06-11202 (KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization"); *Dai-Ichi Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding Corp.),*

36

242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or lease of property of the estate under [section 363(b)], courts require the debtor to show that a sound business purpose justifies such actions . . . ."); *Delaware & Hudson Ry. Co.*, 124 B.R. at 176 (sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a sound business reason justifies such a sale); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983) (concluding that "there must be some articulated business justification, other than appeasement of major creditors, for using, selling or leasing property out of the ordinary course of business before the bankruptcy judge may order such disposition under section 363(b)"); *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating that the "sound business purpose test" is appropriate). Once a court has determined there is a sound business justification for a sale outside of a plan, the court must also determine that (i) the trustee has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair and reasonable and (iii) the purchaser is proceeding in good faith. *Delaware & Hudson*, 124 B.R. at 176.

59.    The Debtors submit that the sale of the Assets is based upon their sound business judgment.    As explained above, the Debtors have determined that a sale, conducted in accordance with the Bidding Procedures, is in the best interest of their estates. Despite their best efforts, the Debtors have not obtained sufficient support for a chapter 11 plan that the Debtors believe is confirmable at this time. As a result, and cognizant of their current Monthly Cash Outlay, continued use of cash collateral, the depletion of their assets through normal operations, and their fiduciary obligation to maximize distributable value for all creditors, the Debtors determined to seek approval of a sale and marketing process for their Assets. The Debtors believe that commencing a sale process at this time will allow them to obtain the highest market

value available for the Assets and set a path to a chapter 11 exit (and resultant cessation of cash outlay) while preserving the Debtors' right to exercise their fiduciary duties should a value-maximizing alternative materialize.

60.     The Debtors also meet the additional requirements necessary to approve a sale under Bankruptcy Code section 363.  As stated herein, the Debtors will provide adequate notice of the Sale to interested parties, and the Debtors believe that the notice procedures described herein are reasonable and adequate under the circumstances.  Additionally, the Debtors will enter into a Purchase Agreement only after a substantial and deliberate effort to market the Assets and if the sale price is fair and reasonable.  Accordingly, the Debtors submit that it is a valid exercise of their business judgment to seek the relief requested by this motion.

**D.     The Proposed Sale Transaction Satisfies the Requirements of Bankruptcy Code Section 363(f) for a Sale Free and Clear of Interests.**

61.     Bankruptcy Code section 363(f) provides that a sale of encumbered property "free and clear of any interest" is permissible, only if "applicable non-bankruptcy law permits sale of such property free and clear of such interest," entities holding interests in the property consent to the sale, "such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property, such interest is in bona fide dispute, *or* such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest."  11 U.S.C. § 363(f) (emphasis supplied).

62.     Bankruptcy Code section 363(f) is drafted in the disjunctive and, as such, it is necessary to meet only one of these five conditions.  To the extent an entity with liens on the Assets does not consent to the proposed Sale Transaction, the Debtors believe that they will be able to demonstrate at the Sale Hearing satisfaction of the requirements of Bankruptcy Code section 363(f).  Alternatively, the Debtors may sell the Assets free and clear of any other

38

interests under section 363(f)(5), because the liens on any Assets sold will attach to the proceeds

of such a sale and entities holding such interests could be compelled to accept money satisfaction

in legal or equitable proceedings.  Accordingly, pursuant to Bankruptcy Code section 363, the

Debtors may sell the Assets free and clear of all liens, claims, and encumbrances.

   63.  The Debtors also submit that it is appropriate to sell the Assets free and clear of

successor liability relating to the Debtors' business.  Such a provision ensures that the Successful

Bidder is protected from any claims or lawsuits premised on the theory that the Successful

Bidder is a successor in interest to one or more of the Debtors.  Courts have consistently held

that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and

clear from successor liability relating to the debtor's business.  *See, e.g., United States

v. Knox-Schillinger (In re Trans World Airlines, Inc.)*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale

of assets pursuant to section 363(f) barred successor liability claims for employment

discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992

Benefit Plan v. Leckie Smokeless Coal. Co.* (*In re Leckie Smokeless Coal Co.*), 99 F.3d 573,

585-86 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes);

*Amphenol Corp. v. Shandler* (*In re Insilco Techs., Inc.*), 351 B.R. 313, 321-22 (Bankr. D. Del.

2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that

a creditor will file suit based on a successor liability theory); *In re General Motors Corp.*,

407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009), *aff'd sub nom., In re Motors Liquidation Corp.*,

428 B.R. 43 (S.D.N.Y. 2010) & 430 B.R. 65 (S.D.N.Y. 2010) (holding that "[T]he law in this

Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and

clear of successor liability claims, and in that connection, will issue the requested findings and

associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("[*I*]*n*

*personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

64.    The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances, and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct.  Moreover, without such assurances, the Debtors would run the risk that potential bidders may not enter the auction or, if they did, would do so with reduced bid amounts.  To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear.

**E.    A Successful Bidder Should Be Entitled to the Protections of Bankruptcy Code Section 363(m).**

65.    Pursuant to Bankruptcy Code section 363(m), a good faith purchaser is one who purchases assets for value, in good faith, and without notice of adverse claims.  *Mark Bell Furniture Warehouse, Inc., v. D. M. Reid Assocs., Ltd.* (*In re Mark Bell Furniture Warehouse, Inc.*), 992 F.2d 7, 8 (1st Cir. 1993); *In re Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir. 1985); *In re Congoleum Corp.*, No. 03-51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); *Abbotts Dairies of Pa.*, 788 F.2d 143, 147 (3d Cir. 1986).

66.    Any agreement consummating a Sale or Sales will be negotiated at arm's-length by sophisticated parties, each represented by their own advisors.  Accordingly, the Debtors request that the Sale Order (or Sale Orders) include a provision that the Successful Bidder (or Successful Bidders) for the Assets, is a "good faith" purchaser within the meaning of Bankruptcy Code section 363(m).  The Debtors believe that providing any Successful Bidder with such

protection will ensure that the maximum price will be received by the Debtors for the Assets and closing of the same will occur promptly.

**F.      Notice of the Auction and Sale Hearing Is Reasonable and Appropriate.**

67.     The Debtors submit that the Sale Notice as set forth above, along with publication of the Sale Notice as described herein above on one occasion on the Mailing Date or as soon as reasonably practicable thereafter (and in local publications of general circulation as the Debtors deem appropriate) is reasonable and appropriate and will be adequate to ensure that all interested parties have the opportunity to bid for the Assets, and/or object to the proposed sale of the Debtors' Assets.     Accordingly, the Debtors submit that the foregoing method of notice is reasonable under the circumstances.

**G.      Assumption and Assignment of Executory Contracts and Unexpired Leases Should Be Authorized.**

68.     Bankruptcy Code section 365(a) provides, in pertinent part, that a debtor in possession "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  The standard governing a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection.  *See, e.g.*, *In re HQ Global Holdings, Inc*., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); *In re Market Square Inn, Inc*., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court" (citation omitted)); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp*., 872 F.2d 36, 39-40 (3d Cir. 1989) (same).  If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract.

*See Grp. of Inst. Investors v. Chicago M. St. P. & P.R.R. Co.*, 318 U.S. 523 (1943); *Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d at 39-40.  The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate."  *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting *In re Stable Mews Assocs.*, 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)).  Any more exacting scrutiny would slow the administration of a debtor's estate, increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially.  *See Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985) (citation omitted).  In addition, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1)(A).

69.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract.  *See L.R.S.C. Co. v. Rickel Home Ctrs., Inc. (In re Rickel Home Ctr., Inc.)*, 209 F.3d 291, 299 (3d Cir. 2000) (indicating that "[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); *Leonard v. General Motors Corp. (In re Headquarters Dodge, Inc.)*, 13 F.3d 674, 682 (3d Cir. 1994) (noting that purpose of Bankruptcy Code section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

70.    Bankruptcy Code section 365(f) provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided."  11 U.S.C. § 365(f)(2).  The meaning of "adequate assurance of

42

future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." *In re DBSI, Inc.*, 405 B.R. 698, 708 (Bankr. D. Del. 2009); *EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.)*, 139 B.R. 585, 592 (S.D.N.Y. 1992); *In re Decora Indus.*, 2002 U.S. Dist. LEXIS 27031, at * 23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment" (citation omitted)); *Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

71.     Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

72.     To facilitate and effect the proposed Sale Transaction, the Debtors request approval of the assumption and assignment of any Acquired Contracts to any Successful Bidder under Bankruptcy Code section 365.  The Debtors further request that the Sale Order(s) provide that the Acquired Contracts will be transferred to, and remain in full force and effect for the benefit of, the Successful Bidder(s) notwithstanding any provisions in the Acquired Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

73.     Any Successful Bidder must (i) submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction, including the assumption of the Acquired Contracts at the closing of the Asset Purchase Agreement and (ii) provide adequate assurance of future performance in connection with any assigned executory contracts

and leases.  Furthermore, to the extent that any defaults exist under any executory contract or

unexpired lease that is to be assumed and assigned in connection with the sale of the Assets, the

Successful Bidder will cure any such default prior to such assumption and assignment.

74.    The Debtors will present facts at the Sale Hearing to demonstrate the financial

credibility, willingness, and ability of the Successful Bidder to perform under the Acquired

Contracts.    The Sale Hearing thus will afford the Court and other interested parties the

opportunity to evaluate the ability of the Successful Bidder to provide adequate assurance of

future performance under the Acquired Contracts, as required under Bankruptcy Code section

365(b)(1)(C).    Further, as set forth above, the Debtors will give notice to all parties to the

Acquired Contracts or the Previously Omitted Contracts of their intention to assume the

Acquired Contracts or the Previously Omitted Contracts, as the case may be, and what the

Debtors believe are the Cure Amounts.

75.    Accordingly, the Debtors submit that implementation of the proposed Assumption

and Assignment Procedures is appropriate in these cases.  The Court therefore should have a

sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set

forth in the Successful Bidder's Asset Purchase Agreement.

**H.    Request for Relief Pursuant to Bankruptcy Rules 6004(h) and 6006(d)**

76.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or

lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the

court orders otherwise."  Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) further provides

that an "order authorizing the trustee to assign an executory contract or unexpired lease under

§ 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court

orders otherwise." Fed. R. Bankr. P. 6006(d).

44

77.     The Debtors believe that any Sale Transaction should be consummated as soon as practicable to preserve and maximize value.  Accordingly, the Debtors request that any Sale Order approving the sale of the Assets and the assumption and assignment of the Designated Contracts be effective immediately upon entry of such order and that the fourteen-day stay under Bankruptcy Rules 6004(h) and 6006(d) be waived.

## **NOTICE**

78.     No trustee or examiner has been appointed in the Debtors' chapter 11 cases.  The Debtors have provided notice of this motion to (i) the U.S. Trustee, Attn: Jane Leamy, Esq.; (ii) counsel to the Committee; (iii) counsel to the agents under the Debtors' pre-petition credit facilities; (iv) counsel to the Ad Hoc Group of Second Lienholders; (v) counsel to the indenture trustees under the Debtors' pre-petition indentures; (vi) the SEC; (vii) the Internal Revenue Service; and (viii) any parties entitled to notice pursuant to Local Rule 2002-1(b).  In light of the nature of the relief requested in this motion, the Debtors respectfully submit that no further notice is necessary.

RLF1 12987524v.1

**WHEREFORE**, the Debtors respectfully request that the Court (i) enter the Bidding Procedures Order, (iii) after the Sale Hearing, enter the Sale Order or Sale Orders and (iii) grant such other and further relief as is just and proper.

Wilmington, Delaware
Date: September 17, 2015

*/s/ Amanda R. Steele*

**RICHARDS, LAYTON & FINGER, P.A**.
Paul N. Heath (DE 3704)
Amanda R. Steele (DE 5530)
Rachel L. Biblo (DE 6012)
One Rodney Square
920 North King Street
Wilmington, Delaware 19801
Telephone: (302) 651-7700
Facsimile: (302) 651-7701

– and –

**AKIN GUMP STRAUSS HAUER & FELD LLP**
Charles R. Gibbs (admitted *pro hac vice*)
Sarah Link Schultz (admitted *pro hac vice*)
Travis A. McRoberts (DE 5274)
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Telephone: (214) 969-2800
Facsimile: (214) 969-4343

Ashleigh L. Blaylock (admitted *pro hac vice*)
Robert S. Strauss Building
1333 New Hampshire Avenue, N.W.
Washington, DC 20036-1564
Telephone: (202) 887-4000
Facsimile: (202) 887-4288

**COUNSEL FOR DEBTORS AND DEBTORS IN POSSESSION**

RLF1 12987524v.1