## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Quicksilver Resources Inc., *et al.*,[1] | Case No. 15-10585 (LSS) |
| Debtors. | Jointly Administered |
| | **Hearing Date: November 3, 2015 at 10:00 a.m. (ET)**<br>**Objection Deadline: October 19, 2015 at 4:00 p.m. (ET)** |

## MOTION OF THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS FOR LEAVE, STANDING AND AUTHORITY TO PROSECUTE CLAIMS ON BEHALF OF THE DEBTORS' ESTATES AND FOR RELATED RELIEF

The Official Committee of Unsecured Creditors (the "Committee") of Quicksilver Resources Inc. ("Quicksilver") and its affiliated chapter 11 debtors and debtors-in possession (collectively, the "Debtors"), by and through its undersigned counsel, hereby files this *Motion of the Official Committee of Unsecured Creditors for Leave, Standing and Authority to Prosecute Claims on Behalf of the Debtors' Estates and for Related Relief* (the "Motion") for entry of an order authorizing the Committee to pursue and, if appropriate, settle certain Claims (defined below) against the Second Lien Parties (defined below) on behalf of the Debtors' estates. In support of the Motion, the Committee respectfully states as follows:

### PRELIMINARY STATEMENT

The Debtors' estates hold meritorious claims against the Second Lien Parties that, when successfully prosecuted, will provide a substantial source of recovery for unsecured creditors. Simply put, the Debtors own assets of material value that are not part of the collateral securing

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are: Quicksilver Resources Inc. [6163]; Barnett Shale Operating LLC [0257]; Cowtown Drilling, Inc. [8899]; Cowtown Gas Processing L.P. [1404]; Cowtown Pipeline Funding, Inc. [9774]; Cowtown Pipeline L.P. [9769]; Cowtown Pipeline Management, Inc. [9771]; Makarios Resources International Holdings LLC [1765]; Makarios Resources International Inc. [7612]; QPP Holdings LLC [0057]; QPP Parent LLC [8748]; Quicksilver Production Partners GP LLC [2701]; Quicksilver Production Partners LP [9129]; and Silver Stream Pipeline Company LLC [9384]. The Debtors' address is 801 Cherry Street, Suite 3700, Unit 19, Fort Worth, Texas 76102.

the obligations owed to the Second Lien Parties: certain liens are unperfected and significant assets are not included in the relevant security documents. The Debtors stated under the penalty of perjury, and as of the date of this Motion it remains uncontroverted by any party in interest, that the following assets of the Debtors are unencumbered:

> (i) the oil and gas leases and wells owned by [Quicksilver] in Pecos County, Upton County, Reeves County, Presidio County, Culberson County and Crockett County, Texas, (ii) approximately 8.1% of the total value of proved hydrocarbon interests owned by [Quicksilver] in the Barnett Shale located in the Fort Worth basin of North Texas…, (iii) that certain *Amended and Restated Intercompany Note*, dated as of October 7, 2011 … with a face value of approximately $413 million, (iv) approximately $167.5 million of cash and cash equivalents … and (v) certain other non-oil and gas real property and the personal property related thereto including, but not limited to, surface lands, inventory and prepayments received by the Debtors.

*Declaration of Vanessa Gomez LaGatta In Support of First Day Pleadings* [D.I. 19] ¶ 28; Cash Collateral Motion (defined below) ¶ 15. Because the Debtors are prevented from asserting their meritorious claims, including those relating to these identified unencumbered assets, the Committee must be granted authority to file and prosecute the necessary complaint.

Given the Debtors' inability to bring these claims, the Committee is the logical and proper party to pursue them. The Debtors should not oppose the Committee's request, because they agree that substantial assets are not part of the collateral securing the Second Lien Parties' claims. And considering the Second Lien Parties' recent pleadings in these cases, they apparently have no objection on the merits to the relief requested. Instead, it appears that the Second Lien Parties may oppose this Motion only for tactical gain by insisting that the litigation to come proceed on an extremely truncated schedule.[2]

---

[2] *See Joint Objection of the Second Lien Secured Parties to the Motion of the Official Committee of Unsecured Creditors to Extend the Challenge Period Deadline* [D.I. 655] ¶ 14 ("The time has come for the Committee to lay its

The Committee files this Motion seeking authority to file a complaint (and any other applicable form of request for relief) and pursue on behalf of the Debtors' estates the Claims for declaratory, monetary, equitable and other relief against the Second Lien Parties, and if appropriate in the Committee's judgment, enter into settlements resolving the Claims.  A draft of the proposed complaint (the "Complaint") is attached hereto as Exhibit A.[3]

Through the Complaint, the Committee seeks: (i) a declaratory judgment that certain property is not subject to the liens or security interests of the Second Lien Collateral Agent (defined below); (ii) a declaratory judgment that the Second Lien Collateral Agent's liens on or security interests asserted in certain Unencumbered Hydrocarbon Interests (defined below) are unperfected; (iii) an order avoiding the Second Lien Collateral Agent's unperfected liens on or security interests in certain property pursuant to sections 544, 550 and 551 of the Bankruptcy Code; (iv) recovery for the Debtors' estates of all costs and expenses incurred in preserving the Second Lien Collateral (defined below) pursuant to section 506(c) of the Bankruptcy Code; (v) a declaratory judgment that, based on the equities of the case, the Second Lien Collateral Agent does not hold any liens on or security interests in post-petition proceeds of any of the Second Lien Collateral; (vi) a judgment that the Second Lien Parties' secured claims shall be reduced to the value of the Second Lien Collateral where the Second Lien Parties can assert perfected liens and with any excess amounts being reclassified as a general unsecured claim pursuant to section 502(d) of the Bankruptcy Code; (vii) a judgment that the Second Lien Parties' claims under section 507(b) shall be disallowed and (viii) disallowance of the Second Lien Parties' claims asserted in these chapter 11 cases pursuant to sections 502 and 506 of the Bankruptcy Code until

---

cards on the table" and "an expedited litigation schedule is necessary not to jeopardize the Second Lien Secured Parties' rights in [the Debtors' sale process]").

[3] The Committee reserves the right to amend the Complaint, including revisions related to further and updated identification of the Second Lien Lenders.  To the extent any counts of the Complaint require the Debtors to be parties for purposes of adjudication, the Committee reserves the right to add the Debtors as nominal defendants.

the Court enters judgment on the Complaint by final order (collectively (i) – (viii), the "Claims").

The Committee requests authority to bring the Claims because, at the outset of these cases, by virtue of the stipulations contained in the *Final Order Under 11 U.S.C. §§ 105, 361, 362, 363 and 507, and Bankruptcy Rules 2002, 4001 and 9014(I) Authorizing Debtors to Use Cash Collateral and (II) Granting Adequate Protection to Prepetition Secured Parties* [D.I. 307] (the "Final Cash Collateral Order"),[4] the Debtors fully compromised and waived their ability to (i) object to the amount or nature of the Second Lien Parties' claims, (ii) assert claims against the Second Lien Parties related to, among other things, the validity and enforceability of the Second Lien Collateral Agent's liens and security interests, and (iii) assert any claim or charge arising out of or based on sections 506(c) or 552(b) of the Bankruptcy Code.  The Debtors' waiver of their ability to bring the Claims, however, was without prejudice to the Committee's right to assert such Claims.  *See* Final Cash Collateral Order ¶¶ 4, 22.

The Committee's investigation to date has revealed assets worth tens (and perhaps even hundreds) of millions of dollars that are excluded from the collateral securing the Second Lien Obligations because no liens were created under the Second Lien Collateral Documents or, to the extent that liens were created, not subject to perfected liens or security interests.  The Committee believes that the Claims are meritorious, and successful prosecution of the Claims will result in a material recovery that will fund distributions to the Debtors' unsecured creditors.  Because the Debtors cannot pursue the Claims under the express terms of the Final Cash Collateral Order, the Claims will not be prosecuted if the Motion is denied.  Accordingly, it is imperative that the Court grant the Committee standing to prosecute the Claims on behalf of the Debtors' estates.

---

[4] Capitalized terms used herein but not otherwise defined shall have the meanings ascribed to such terms as in the Final Cash Collateral Order.

As fully set forth below, all of the legal requirements for granting the Committee derivative standing to pursue the Claims on behalf of the Debtors' estates have been satisfied. Prosecution of the Claims is critical in these cases because the benefits therefrom will address substantial issues in these cases which must be resolved before the parties can work to propose and confirm a chapter 11 plan.    Given the Debtors' inability to prosecute the Claims, the Committee is the only party in interest qualified and sufficiently prepared to prosecute the Claims.    Thus, for the reasons set forth herein, the Committee seeks authority to file and prosecute the Claims against the Second Lien Parties to preserve valuable estate assets for the benefit of the Debtors' unsecured creditors.

## JURISDICTION

1.      The United States Bankruptcy Court for the District of Delaware (the "Court") has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334.    This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2), and the Court may enter a final order consistent with Article III of the United States Constitution.[5]

2.      Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The statutory predicates for the relief requested herein are sections 105(a), 1103(c), 1107(a) and 1109(b) of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (as amended and modified, the "Bankruptcy Code") and Rules 3007 and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

---

[5] Pursuant to Rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), the Committee hereby confirms its consent to entry of a final order by this Court in connection with this Motion if it is later determined that the Court, absent the consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

# BACKGROUND

## A.    General Background

4.      On March 17, 2015 (the "Petition Date"), each of the Debtors filed a voluntary

petition for relief under chapter 11 of the Bankruptcy Code in the Court.  The Debtors continue

to operate their businesses and manage their properties as debtors in possession pursuant to

Bankruptcy Code sections 1107(a) and 1108.  No request for the appointment of a trustee or

examiner has been made in these chapter 11 cases.

5.      On March 25, 2015, the Office of the United States Trustee for the District of

Delaware (the "U.S. Trustee") appointed the Committee.  The Committee consists of the

following members:  Ares Special Situations Fund IV, L.P., Trunkline Gas Company LLC,

Wilmington Trust, National Association, as Indenture Trustee, Delaware Trust Company, as

Indenture Trustee and U.S. Bank National Association, as Indenture Trustee.

## B.    Cash Collateral Motion and Final Order

6.      On the Petition Date, the Debtors filed the *Debtors' Motion for Entry of Interim
and Final Orders (A) Authorizing the Use of Cash Collateral, (B) Granting Prepetition Secured
Parties Adequate Protection, (C) Scheduling a Final Hearing, and (D) Granting Related Relief*
[D.I. 16] (the "Cash Collateral Motion").

7.      On May 1, 2015, the Court entered the Final Cash Collateral Order.  Pursuant to

the Final Cash Collateral Order, the Debtors admitted, stipulated and agreed, among other things,

that:

> (i) the U.S. Obligors were indebted and liable to the Second Lien
> Lenders, without defense, counterclaim or offset of any kind, for
> the Second Lien Credit Agreement Obligations;
>
> (ii) the Second Lien Credit Agreement Obligations constitute legal,
> valid and binding obligation of the U.S. Debtor Obligors;

(iii) no portion of the Second Lien Credit Agreement Obligations and no amounts paid to the Second Lien Agent or the Second Lien Lenders is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery or subordination or other challenge and the Debtors do not have any claims, counterclaims, causes of action, defenses or setoff rights related to the Second Lien Credit Agreement Obligations or the Second Lien Credit Documents;

(iv) the U.S. Debtor Obligors were indebted and liable to the Second Lien Noteholders, without defense, counterclaim or offset of any kind, for all of the Second Lien Indenture Obligations;

(v) the Second Lien Indenture Obligations constitute the legal, valid and binding obligation of the U.S. Debtor Obligors;

(vi) no portion of the Second Lien Indenture Obligations and no amounts paid to the Second Lien Indenture Trustee or the Second Lien Noteholders is subject to contest, attack, objection, recoupment, defense, setoff, counterclaim, avoidance, recharacterization, reclassification, reduction, disallowance, recovery or subordination or other challenge and the Debtors do not have any claims, counterclaims, causes of action, defenses or setoff rights related to the Second Lien Indenture Obligations or the Second Lien Indenture Documents; and (vii) the Liens and security interests granted to the Second Lien Indenture Trustee to secure the Second Lien Obligations pursuant to and in connection with the Second Lien Collateral Documents are valid, binding, perfected, enforceable, second priority liens and security interests on the Prepetition Collateral (other than Prepetition Collateral constituting setoff rights of the Global Administrative Agent and the U.S. Lenders), subject to the Intercreditor Agreement and permitted exceptions under the U.S. First Lien Documents and the Second Lien Credit Documents and are not subject to objection, defense, contest, avoidance, recharacterization, reclassification, reduction or subordination.

*See* Final Cash Collateral Order ¶ 4(l)-(r).  The Final Cash Collateral Order provides that the

Debtors' stipulations and admissions "shall be binding upon the Debtors … [and] all other

parties in interests, including [the] Committee … unless (a) the Committee … has duly filed an

adversary proceeding or contested matter … challenging the validity, enforceability, priority or

extent of the Prepetition Obligations or the liens on the Prepetition Collateral securing the

Prepetition Obligations[.]"  *Id.* ¶ 22.  Thus, as a result of the Final Cash Collateral Order, the Debtors were required to relinquish their ability to assert any and all claims with respect to the Second Lien Obligations, Prepetition Collateral and against the Second Lien Parties. Notwithstanding the Debtors' inability to bring the Claims, out of an abundance of caution, the Committee provided the Debtors with two demands (collectively, the "Demand"), attached hereto as Exhibit B, specifying the Claims and demanding that the Debtors assert and prosecute the Claims against the Second Lien Parties.  The Debtors responded timely, and as expected, they declined to commence an action asserting the Claims solely due to the limitations resulting from the terms of the Final Cash Collateral Order, and not based on the merits of the Claims.

C.      **Summary of Key Facts Regarding the Claims**

        8.      On or about June 21, 2013, Quicksilver entered into the Second Lien Credit Agreement with the Second Lien Agent and the Second Lien Lenders.  Pursuant to the Second Lien Credit Agreement, the Second Lien Lenders made available to Quicksilver a $625 million second lien term loan scheduled to mature on June 21, 2019.  Borrowings under the Second Lien Credit Agreement are guaranteed by certain of Quicksilver's subsidiaries, and are secured on a second lien basis by certain collateral (collectively, the "Second Lien Collateral").  The Second Lien Lenders' security interest in the Second Lien Collateral is junior in priority to the liens securing the first lien U.S. Credit Agreement Obligations and the Canadian Credit Agreement Obligations.

        9.      Contemporaneous with Quicksilver's entry into the Second Lien Credit Agreement, Quicksilver entered into the Second Lien Indenture, which governs Quicksilver's $200 million aggregate principal amount second lien notes.  The Second Lien Indenture Obligations are guaranteed by certain of Quicksilver's subsidiaries, and are secured on a second

lien basis by the Second Lien Collateral *pari passu* with the Second Lien Credit Agreement Obligations.

10.    In connection with Quicksilver's entry into the Second Lien Credit Agreement and the Second Lien Indenture, Quicksilver entered into the Second Lien Mortgages granting the Second Lien Indenture Trustee, as second lien collateral agent (in its capacity as second lien collateral agent, the "Second Lien Collateral Agent"), for the benefit of the Second Lien Lenders and the Second Lien Noteholders, a security interest in and liens on the Second Lien Collateral. The Second Lien Collateral generally consists of certain of Quicksilver's oil and gas properties and related assets.    Importantly, the Second Lien Mortgages do not grant the Second Lien Collateral Agent an "all assets" lien.    Instead, only collateral specifically described as securing the Second Lien Obligations is considered Second Lien Collateral.

11.    Although the Second Lien Collateral Agent does not hold a valid security interest in all of the Debtors' assets (and the Final Cash Collateral Order is structured such that it accounts for this reality) securing the Second Lien Obligations, the Second Lien Collateral Agent has not yet asserted which assets it believes are encumbered and concedes as unencumbered. However, the Second Lien Agent and Second Lien Indenture Trustee each filed proofs of claim in the Debtors' cases.    The Second Lien Agent's and Second Lien Indenture Trustee's descriptions of the collateral securing the Second Lien Obligations are materially different despite the fact that the Second Lien Obligations are all secured by one set of collateral documents.    The Second Lien Agent's proof of claim asserts a secured claim and "security interest in and continuing lien on substantially all of [the Debtors'] assets and property, and all proceeds, products, accessions, rents and profits thereof...." *See* Proof of Claim at Exhibit A, ¶ 5, *In re Quicksilver et al.*, Case No. 15-10585 (LSS) (Bankr. D. Del.) (Claim No. 417).

Conversely, the Second Lien Indenture Trustee's proof of claim more narrowly describes certain categories of assets over which it asserts liens and security interests. *See* Proof of Claim at *Statement in Support of Proof of Claim of the Bank of New York Mellon as Indenture Trustee and Second Lien Collateral Agent* at 4-9, *In re Quicksilver et al.*, Case No. 15-10585 (LSS) (Bankr. D. Del.) (Claim Nos. 468, 469, 470, 471, 472, 473 and 474). Notwithstanding the lack of any specificity provided by the Second Lien Parties with respect to their asserted liens and security interests, the Debtors' stipulations and waivers in the Final Cash Collateral Order purport to attempt to foreclose on the Committee's (and any other party-in-interest's) ability to bring any claims challenging the "validity, enforceability, priority or extent" of any of the Second Lien Parties' liens after expiration of the Challenge Period. Likewise, the Debtors' stipulations in the Final Cash Collateral order preclude any objections to the Second Lien Parties' claims following expiration of the Challenge Period.

12.    As a fiduciary that owes obligations to the Debtors' unsecured creditors, the Committee undertook and completed an investigation during the Challenge Period of, among other things, the liens and security interests granted in the Second Lien Mortgages, whether such liens and security interests are valid, binding, perfected and enforceable, as well as the potential objections to the Second Lien Parties' proofs of claim, and potential claims against the Second Lien Parties arising out of or based on sections 506(c) or 552(b) of the Bankruptcy Code. In connection with this investigation, the Committee has determined that the Debtors own assets of substantial value that are not subject to the Second Lien Collateral Agent's security interests, and if subject to such security interests, the liens on certain assets are unperfected.

13.    Because the Committee will not be able to assert claims challenging the Second Lien Collateral Agent's liens and security interests after expiration of the Challenge Period, and

because the Second Lien Collateral Agent has not yet identified with specificity the assets it will assert are subject to perfected liens and security interests, the Committee files this Motion for authority to file the attached Complaint seeking to resolve issues regarding the validity, enforceability, extent and perfection of the Second Lien Collateral Agent's liens and security interests, as well as to object to the Second Lien Parties' proofs of claim and to assert claims against the Second Lien Parties pursuant to sections 506(c) and 552(b) of the Bankruptcy Code. Accordingly, the Committee seeks authority to prosecute the Claims against the Second Lien Parties to preserve valuable estate assets for the benefit of the Debtors' unsecured creditors.

## RELIEF REQUESTED

14.    The Committee hereby requests that this Court grant the Committee leave, standing and authority to file the Complaint, prosecute the Claims and, if appropriate, sole authority to propose one or more settlements with respect to all or a portion of the Claims, on behalf of the Debtors' estates.

## BASIS FOR RELIEF

A.    **The *Cybergenics* Standard for Derivative Standing is Satisfied.**

15.    It is well settled within this and other circuits that bankruptcy courts may allow a creditors' committee to pursue causes of action on behalf of the estate under appropriate circumstances. *See Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 575 (3d Cir. 2003); *Official Comm. of Unsecured Creditors v. Clark (In re Nat'l Forge Co.)*, 304 B.R. 214 (Bankr. W.D. Pa. 2004), *aff'd* 326 B.R. 532 (W.D. Pa. 2005); *see also Liberty Mut. Ins. Co. v. Official Unsecured Creditors Comm. (In re Spaulding Composites Co.)*, 207 B.R. 899, 904 (B.A.P. 9th Cir. 1997); *La. World Exposition v. Fed. Ins. Co.*, 858 F.2d 233, 247 (5th Cir. 1988); *Unsecured Creditors Comm. v. Noyes (In re STN Enters.)*, 779 F.2d 901, 904 (2d Cir. 1985).

16.     Although the Bankruptcy Code does not expressly authorize a creditors' committee to initiate an adversary proceeding and/or pursue other causes of action typically brought by the trustee or the debtor in possession, the Bankruptcy Code established creditors' committees for the express purpose of protecting the rights of their constituents and similarly situated creditors. *See* H.R. Rep. No. 95-595, at 91 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6053. In furtherance of this purpose, Bankruptcy Code section 1103(c), which enumerates the statutory functions of a creditors' committee, authorizes creditors' committees to "perform such other services as are in the interest of those represented." 11 U.S.C. § 1103(c)(5). To that end, Bankruptcy Code section 1109(b) provides, in pertinent part, that:

> A party in interest, including the debtor, the trustee, a creditors' committee, an equity security holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on any issue in a case under this chapter.

11 U.S.C. § 1109(b). A committee's general right to be heard in bankruptcy proceedings would be rendered meaningless unless such committees are also given the right to act, on behalf of the estate, if a debtor in possession or trustee, who is explicitly granted the right to act, unjustifiably fails to act. *See In re iPCS, Inc.*, 297 B.R. 283, 290 (Bankr. N.D. Ga. 2003) ("[I]f a debtor has a cognizable claim, but refuses to pursue that claim, an important objective of the Code [the recovery and collection of estate property] would be impeded if the bankruptcy court has no power to authorize another party to proceed on behalf of the estate in the debtor's stead."); *see also Cybergenics*; 330 F.3d at 568-69 (holding sections 1101(c)(5) and 1109(b) of the Bankruptcy Code implicitly authorize a court to grant a creditors' committee derivative standing to prosecute an avoidance action when the trustee or debtor in possession cannot or will not do so, or when the debtor in possession is unlikely to act); *In re Joyanna Holitogs, Inc.*, 21 B.R. 323, 326 (Bankr. S.D.N.Y. 1982) (holding that the general right to be heard would be an empty

grant unless those who have such a right are also given the authority to act when the debtors refuse to do so).

17.    Derivative standing is warranted in instances where – like here – the debtor-in-possession is unable or unwilling to pursue estate claims.  In *Cybergenics,* the Third Circuit Court of Appeals held that the Bankruptcy Code manifests "Congress's approval of derivative avoidance actions by creditors' committees, and the bankruptcy courts' equitable powers enable them to authorize such suits" where a debtor does not or cannot pursue the action.  330 F.3d 548 at 533; *see also In re Centaur, LLC,* 2010 Bankr. LEXIS 3918, at *13 (Bankr. D. Del. Nov. 5, 2010) ("There is no dispute that under [*Cybergenics*], the Third Circuit has held that bankruptcy courts can confer derivative standing upon creditors' committees to bring actions to recover property for the benefit of the estate.").

18.    While the *Cybergenics* court did not specifically set forth the procedures for allowing derivative standing to creditors' committees, "[t]he Third Circuit expressed its agreement with guidelines established by the Second and Seventh Circuits that entitlement to derivative standing requires: (1) a colorable claim, (2) that the trustee unjustifiably refused to pursue the claim, and (3) permission of the bankruptcy court to initiate the action." *Centaur,* 2010 Bankr. LEXIS 3918, at *13 (citing *Infinity Investors Ltd. v. Kingsborough (In re Yes! Entm't Corp.),* 316 B.R. 141, 145 (D. Del. 2004)); *Official Comm. Of Unsecured Creditors of Nat'l Forge Co. v. Clark (In re Nat'l Forge Co.),* 326 B.R. 532, 550 (W.D. Pa. 2005) (holding that "because the Committee asserted claims that are facially colorable and of significant potential benefit to the unsecured creditors, and because the Debtor and/or its successor in liquidation were not in a position to effectively prosecute those claims, it was appropriate and

consistent with the best interests of the estate for the Bankruptcy Court to authorize the Committee's lawsuit").

19.    The Committee's proposed Complaint asserts colorable Claims that, when proven at trial, will deliver a benefit to the Debtors' estates and a material distribution for unsecured creditors.    However, the Stipulations prevent the Debtors from asserting and prosecuting the Claims, thus the Committee is entitled to derivative standing under the well-settled guidelines adopted by the Third Circuit.

**B.    The Claims are Colorable.**

20.    A court's first consideration in determining a committee's standing motion is whether a colorable claim exists.    Case law construing the "colorable claim" requirement establishes that the requisite showing is a low threshold to satisfy.    *See, e.g., In re Adelphia Commc'ns Corp.*, 330 B.R. 364, 376 (Bankr. S.D.N.Y. 2005); *In re Trump Entm't Resorts, Inc.*, Case No. 14-12103 (KG) (Bankr. D. Del. Feb. 18, 2015) ("The requirement of a 'colorable claim' is a low hurdle to satisfy.    A claim is 'colorable' if it is 'not wholly insubstantial or frivolous[.]'").    The Court need not weigh evidence or conduct a "minitrial," but only decide whether the Committee has asserted "claims for relief that on appropriate proof would support a recovery." *G-I Holding, Inc. v. Those Parties Listed on Exhibit A (In re G-I Holdings, Inc.)*, 313 B.R. 612, 631 (Bankr. D.N.J. 2004); *see also In re STN Enterprises*, 779 F.2d 901, 905-06 (2d Cir. 1985).    The proper analysis is akin to when a defendant moves to dismiss a complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6). *Centaur*, 2010 Bankr. LEXIS 3918, at *13 (citations omitted); *G-I Holdings*, 313 B.R. at 631 ("Because the creditors' committee is not required to present its proof, the first inquiry is much the same as that undertaken when a defendant moves to dismiss a complaint for failure to state a claim." (quoting *In re iPCS, Inc.*, 297 B.R. 283, 291 (Bankr. N.D. Ga. 2003)); *Official Comm. of Unsecured Creditors of the*

*Debtors v. Austin Fin. Servs., Inc. (In re KDI Holdings, Inc.)*, 277 B.R. 493, 508 (Bankr. S.D.N.Y. 1999). "When considering a motion to dismiss, a court must accept as true the allegations and facts pleaded in the complaint and any and all reasonable inferences derived from those facts." *G-I Holdings*, 313 B.R. at 631 (citations omitted).

21.     The Committee's Claims easily satisfy the low threshold governing colorable claims. All of the elements necessary for the Committee to successfully prosecute the Claims are readily apparent and will be established by the Committee as set forth below.

### *Counts I - XII – Declaratory Judgment Regarding Unencumbered Property Not Subject to the Second Lien Collateral Agent's Liens and Security Interests*

22.     Pursuant to the Second Lien Mortgages and the Second Lien Pledge Agreement (as defined in the Complaint), Quicksilver granted the Second Lien Collateral Agent liens on and security interests in the Second Lien Collateral to secure payment of the Second Lien Obligations. All of the Debtors' property that is not Second Lien Collateral is not subject to the Second Lien Collateral Agent's liens or security interests. Unencumbered Property includes, without limitation: (i) one hundred percent (100%) of the equity of Cowtown Drilling Inc., Makarios Resources International Inc., Makarios Resources International Holdings LLC, Quicksilver Production Partners GP LLC and Quicksilver Production Partners LP and thirty-five percent (35%) of the equity of Quicksilver Resources Canada, Inc. and the interest in Quicksilver Production Partners Operating Ltd.; (ii) all investment accounts; (iii) all tax refunds, including but not limited to the fiscal year 2014 federal tax refund; (iv) all automobiles, trucks and other vehicles; (v) leasehold improvements described by the Debtors as the Burnett Plaza Office Design and Work; (vi) all prepaid insurance premiums; (vii) all notes receivable, including without limitation, the notes receivable from Quicksilver Resources Canada Inc., Dalmac Holdings Inc. and Ristorante La Piazza Patron; (viii) all commercial tort claims; (ix) all cash,

except to the extent such cash constitutes the proceeds of the Second Lien Collateral; (x) all accounts receivable and contract rights, except to the extent such accounts receivable and contract rights are derived from or specifically pertain to Second Lien Collateral; (xi) all computer software, except to the extent such computer software pertains to Second Lien Collateral; (xii) all surface lands and surface rights not correctly described on Exhibit A to the Mortgages; and (xiii) all of the Debtors' rights, titles, interests and estates and the lands and premises covered or affected thereby in and to oil and gas leases, oil, gas and mineral leases, or other liquid or gaseous hydrocarbon leases, fee interests, surface interests, mineral fee interests, overriding royalty and royalty interests, net profit interests and production payment interests, including any reserved or residual interests of whatever nature, in each case, which are not correctly described on Exhibit A to the Mortgages or pooled or unitized with interests that are correctly described on Exhibit A to the Mortgages (the "Unencumbered Hydrocarbon Interests").[6]

23.     Accordingly, none of the Debtors granted the Second Lien Collateral Agent any liens on or security interests in the Unencumbered Property. The enforceability of a security

---

[6] Unencumbered Hydrocarbon Interests also includes (a) all unitization, pooling agreements and declarations of pooled units and the units created thereby (including without limitation all units created under orders, regulations and rules of any governmental authority) which may affect all or any portion of the Unencumbered Hydrocarbon Interests, (b) all operating agreements, contracts and other agreements, including production sharing contracts and agreements, which relate to any of the Unencumbered Hydrocarbon Interests or the production, sale, purchase, transportation, exchange or processing of hydrocarbons from or attributable to such Unencumbered Hydrocarbon Interests, (c) all hydrocarbons in and under and which may be produced and saved or attributable to the Unencumbered Hydrocarbon Interests, including all oil in tanks, and all rents, issues, profits, proceeds, products, revenues and other incomes from or attributable to the Unencumbered Hydrocarbon Interests, (d) all tenements, hereditaments, appurtenances and properties in any manner appertaining, belonging, affixed or incidental to the Unencumbered Hydrocarbon Interests, and (e) all properties, rights, titles, interests and estates described or referred to above, including any and all property, real or personal situated upon, used, held for use or useful in connection with the operating, working or development of any such Unencumbered Hydrocarbon Interests or property, including, any and all oil wells, gas wells, injection wells or other wells, fuel separators, liquid extraction plants, plant compressors, pumps, pumping units, field gathering systems, tanks and tank batteries, fixtures, valves, fittings, machinery and parts, engines, boilers, meters, apparatus, equipment, appliances, tools, implements, cables, wires, towers, casing, tubing and rods, surface leases, rights-of-way, easements and servitudes, together with all additions, substitutions, replacements, accessions and attachments to any and all of the foregoing.

interest in personal property that is created by contract is governed by Article 9 of the Uniform

Commercial Code. *See* N.Y. U.C.C. Law § 9-109(a) (Consol. 2015).[7] Section 9-203(b) of the

U.C.C. provides that, for most types of collateral, a security interest is enforceable only if,

among other things, the security agreement provides a description of the collateral. *Id.* § 9-

203(b). Section 9-108(a) provides that a description of collateral is sufficient if it "reasonably

identifies what is described." *Id.* § 9-108(a).[8] Collateral is reasonably identified if its identity is

"objectively determinable." *Id.* § 9-108(b)(6); *Rice v. Miller*, 864 N.Y.S.2d 255, 258 (N.Y. Sup.

Ct. 2008) ("[C]ollateral is reasonably identified as long as the 'identity of the collateral is

objectively determinable' . . . [in other words,] if a third party could determine what items of the

debtor's collateral are subject to the creditor's security interest" (alterations in original)).

24.     The Mortgages and the Second Lien Pledge Agreement do not provide any

description of the Unencumbered Property, and thus, the Second Lien Collateral Agent does not

hold an enforceable security interest in those assets. *See Official Comm. of Unsecured Creditors

v. UMB Bank, N.A. (In re Residential Capital, LLC)*, 497 B.R. 403, 415 (Bankr. S.D.N.Y. 2013)

(stating that secured lender did not have liens on commercial tort claims because they were not

described with sufficient particularity in the security agreement); *In re Dwek*, 2013 U.S. Dist.

LEXIS 169561, at *27-28 (D.N.J. Nov. 27, 2013) (affirming denial of secured party's motion for

summary judgment where security agreement did not, on its face, reasonably identify collateral);

*Macronet Group, Ltd v. Patterson (In re Macronet Group, Ltd)*, 2004 Bankr. LEXIS 2007, at

*14-15 (Bankr. N.D. Ill. Apr. 22, 2004) (holding that a secured party did not have an enforceable

---

[7] The Mortgages provide that they "shall be construed under and governed by the laws of the State of New York[.]" Mortgages, § 7.10.

[8] Section 9-108(b) provides that "a description of collateral reasonably identifies the collateral if it identifies the collateral by: (1) specific listing; (2) category; (3) ... a type of collateral defined in [the U.C.C.]; (4) quantity; (5) computational or allocational formula or procedure; or (6) ... any other method, if the identity of the collateral is objectively determinable." *Id.* § 9-108(b).

security interest in collateral under Illinois law where the security agreement did not describe the collateral).

25.     In the Final Cash Collateral Order, the Debtors stipulated that "the liens and security interests granted to the Second Lien [Agent] to secure the Second Lien Obligations … are valid, binding, perfected, enforceable, second priority liens and security interests on the Prepetition Collateral[.]"  Final Cash Collateral Order ¶ 4(r).  However, the Second Lien Collateral Agent has not identified with specificity which of the Debtors' assets are included within the definition of Prepetition Collateral and subject to the Second Lien Collateral Agent's putative liens and security interests.  They also have not identified the Debtors' assets that they concede are not encumbered.

26.     Thus, the Committee disputes the Debtors' stipulations in the Final Cash Collateral Order to the extent that the Second Lien Collateral Agent asserts liens on and security interests in the Unencumbered Property.  The Committee has met and exceeded the low threshold of establishing a colorable claim for a declaratory judgment that the Second Lien Collateral Agent does not have liens on or security interests in any of the Unencumbered Property.

### *Count XIII – Declaratory Judgment Regarding Unencumbered Hydrocarbon Interests Not Subject to Perfected Liens and Security Interests of the Second Lien Collateral Agent*

27.     The Mortgages purport to grant the Second Lien Collateral Agent liens on the Debtors' Hydrocarbon Interests and Oil and Gas Properties (each as defined in the Mortgages). The grant of liens on Hydrocarbon Interests is limited to the properties correctly described on Exhibit A to the applicable Mortgages, or properties pooled or unitized with such properties correctly described on Exhibit A to the Mortgages.  In the event that the Court determines that the Debtors granted liens on the Unencumbered Hydrocarbon Interests, the Second Lien

Collateral Agent did not record a mortgage or deed of trust in respect of any such Unencumbered Hydrocarbon Interests in the appropriate office of the recorder of deeds for the jurisdiction where a given property is located.

28.   Under Texas law, perfection of a lien in real property requires the recording of a mortgage in the county where the property is located.  Tex. Prop. Code § 11.001(a).  Further, because the leases are interests in real property, the Mortgages are subject to the statue of frauds. *Baker Hughes Oilfield Operations, Inc. v. Union Bank of Cal. N. Am. (In re Cornerstone E&P Co., L.P.)*, 435 B.R. 390, 400 (Bankr. N.D. Tex. 2010).  To satisfy the statute of frauds, a recorded mortgage must identify the property with reasonable certainty such that a person familiar with the area would be able to locate the land. *See E&P Lending: Due Diligence and Collateral Legal Issues in E&P Lending Deals for the Texas Law Man in Particular*, 1 Tex. A&M L. Rev. 361, 367 (2013) (citing *Gates v. Asher*, 280 S.W.2d 247, 248-249 (Tex. 1955)).

29.   The Second Lien Collateral Agent failed to properly perfect its purported liens on and security interests in the Unencumbered Hydrocarbon Interests because the leases included in the Unencumbered Hydrocarbon Interests were not correctly described on Exhibit A to the Mortgages and were not pooled or unitized with interests that are correctly described on Exhibit A to the Mortgages.  Thus, the Second Lien Collateral Agent does not hold perfected liens on or security interests in the Unencumbered Hydrocarbon Interests.

30.   Accordingly, the Committee disputes the Debtors' stipulations in the Final Cash Collateral order to the extent that the Debtors stipulated that any Unencumbered Hydrocarbon Interests are subject to the Second Lien Collateral Agent's perfected liens or security interests. The Committee has easily satisfied the minimal standard to show a colorable claim exists for a

declaratory judgment that the Unencumbered Hydrocarbon Interests are not subject to perfected liens of the Second Lien Collateral Agent.

### Count XIV – Avoidance of Unperfected Liens and Security Interests

31.    Because the Second Lien Collateral Agent does not have properly perfected liens on or security interests in the Unencumbered Hydrocarbon Interests, any liens on and security interests in the Unencumbered Hydrocarbon Interests must be avoided pursuant to section 544(a) of the Bankruptcy Code, and such property or the value of such property, to the extent previously transferred, must be recovered by the Debtors' estates pursuant to section 550(a) of the Bankruptcy Code and automatically preserved for the benefit of the Debtors' estates pursuant to section 551 of the Bankruptcy Code.  The Committee certainly meets the threshold to show a colorable claim exists for the avoidance of the Second Lien Collateral Agent's asserted liens on and security interests in the Unencumbered Property.

### Count XV – Recovery of Reasonable, Necessary Costs and Expenses of Preserving, or Disposing of, Certain Property

32.    Section 506(c) of the Bankruptcy Code provides "[t]he trustee may recover from property securing an allowed secured claim the reasonable, necessary costs and expenses of preserving, or disposing of, such property to the extent of any benefit to the holder of such claim…."  The purpose of section 506(c) is to allow a claimant who "expends money to provide for the reasonable and necessary costs and expenses of preserving or disposing of a secured creditor's collateral … to recover such expenses from the secured party or from the property securing an allowed secured claim held by such party," thus "prevent[ing] a windfall to the secured creditor at the expense of the claimant."  *Precision Steel Shearing, Inc. v. Fremont Fin. Corp. (In re Visual Indus., Inc.)*, 57 F. 3d 321, 325 (3d Cir. 1995).  Section 506(c) shifts the costs of preserving or disposing of a secured party's collateral from a debtor to the secured party who

has benefited from the expenditure, "which costs might otherwise be paid from the unencumbered assets of the bankruptcy estate." *Id.*

33.    Upon information and belief, the Debtors have incurred substantial reasonable, necessary costs and expenses to preserve the Second Lien Collateral.  The Committee believes the Debtors have expended well in excess of $25 million to preserve the Second Lien Collateral. Indeed, most of the unencumbered cash has been spent for just that purpose.  Under the Final Cash Collateral Order, the right to surcharge the Second Lien Collateral under Bankruptcy Code section 506(c) was expressly preserved for parties-in-interest, other than the Debtors, and the Committee is entitled to pursue such a claim.

34.    All costs and expenses incurred in preserving the Second Lien Collateral must be recovered by the Debtors' estates pursuant to Bankruptcy Code section 506(c).  *See E & C Holding Co. v. Township of Piscataway (In re Eastern Steel Barrel Corp.)*, 164 B.R. 477 (D.N.J. 1994) (property taxes and sewer charges, including interest and penalties, recovered under 506(c) because municipal services for which taxes were assessed benefited secured creditor); *In re Phoenix Pipe and Tube*, L.P., 174 B.R. 688 (Bankr. E.D. Pa. 1994) (allowing salary and benefits to CEO because management services were essential to production from which secured creditor benefited).  The Committee has satisfied the minimal standard demonstrating a colorable claim for recovery of all costs and expenses incurred in preserving the Second Lien Collateral.

### *Count XVI – Declaratory Judgment That Based on the Equities of the Case the Court Should Prohibit the Attachment of the Second Lien Collateral Agent's Lien on Proceeds, Products and Offspring or Profits of the Second Lien Collateral*

35.    The Committee does not believe that it is required to obtain standing before asserting and prosecuting the claim in Count XVI of the Complaint.  However, out of an abundance of caution, the Committee requests that the Court grant it standing to pursue this

claim in the event it is determined that the Committee requires standing with respect to this count.

36.     Under section 552(b)(1) of the Bankruptcy Code, "if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise." The purpose of the "equities of the case" exception is to prevent a secured creditor from reaping benefits from collateral that has appreciated in value as a result of the debtor's use of other assets of the estate (which normally would go to general unsecured creditors) to cause the appreciated value. *In re Muma Servs.*, 322 B.R. 541, 558-59 (Bankr. D. Del. 2005) (quoting *Delbridge v. Prod. Credit Ass'n*, 104 B.R. 824, 826 (E.D. Mich. 1989)).

37.     The "equities of the case" exception is most commonly invoked where unencumbered assets are used to increase the value of the collateral for the benefit of a secured creditor. *See In re Cross Baking Co.*, 818 F.2d 1027, 1033 (1st Cir. 1987); *Toso v. Bank of Stockton (In re Toso)*, 2007 WL 7540985, at *13-14 (B.A.P. 9th Cir. Jan. 10, 2007). Notably the legislative history to section 552 states that the equities of the case exception "covers the situation where raw materials, for example, are converted into inventory, or inventory into accounts, at some expense to the estate, thus depleting the funds available for general unsecured creditors[.]" S. Rep. No. 95-989, at 91 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5877; *see*

*also In re Mullen*, 172 B.R. 473, 479 (Bankr. D. Mass. 1994) ("As demonstrated by the statements on the floor of both branches, Congress was concerned about the situation where the estate spends money and thereby causes an enhancement in proceeds or rents which improves the position of the secured party.").

38.    The Second Lien Collateral Agent claims to hold perfected liens on and valid security interests in the proceeds of the Second Lien Collateral.  In this case, the Debtors' post-petition proceeds have been generated primarily from operations that have been funded with unencumbered cash and the value generated thereby cannot accrue to the sole benefit of the Second Lien Parties.  The equities of the Debtors' cases strongly favor applying the exception under section 552(b) here.  *See In re Package Design & Supply Co.*, 217 B.R. 422, 425 (Bankr. W.D.N.Y. 1998) (stating that section 552(b) helps to "assure that those who enhance the value of collateral during a bankruptcy case will not lose out to a lien on the 'proceeds' thus enhanced."). This is especially apparent when considering that the Second Lien Parties already are entitled to adequate protection and to assert a claim based on any diminution in the value of their collateral. Based on these protections available to the Second Lien Parties, providing the Second Lien Parties liens on and security interests in post-petition proceeds would result in an inequitable windfall, a result which section 552(b)'s equities of the case exception is intended to prevent.  By reason of the foregoing, the Committee seeks declaratory relief that, pursuant to Bankruptcy Code section 552(b), based on the equities of the case, no lien or security interest should attach to the proceeds of any of the Second Lien Collateral.  Thus, a colorable claim has been asserted for a declaratory judgment that the Second Lien Collateral Agent does not have liens on or security interests in post-petition proceeds based on the equities of the case.

## *Count XVII – Objection to Second Lien Parties' Claims*

39.    The Committee does not believe that it is required to obtain standing before asserting and prosecuting the claim in Count XVII of the Complaint.    However, out of an abundance of caution, the Committee requests that the Court grant it standing to pursue this claim in the event it is determined that the Committee requires standing with respect to this count.

40.    The Second Lien Parties assert secured claims in the full amount of the Second Lien Obligations.    However, the value of the Second Lien Parties' secured claims must be limited to the value of the Second Lien Collateral.    To the extent the Second Lien Parties' asserted secured claims exceed the value of the Second Lien Collateral, any excess should be disallowed as a secured claim and reclassified as a general unsecured claim to the extent allowed and not otherwise subordinated.    *See* 11 U.S.C. § 506(a); *McDonald v. Master Fin., Inc. (In re McDonald)*, 205 F.3d 606, 609 (3d Cir. Pa. 2000) ("Under § 506(a) any allowed claim that is secured by a lien on the debtor's property 'is a secured claim to the extent of the value of [the] creditor's interest in the estate's interest in such property,' and is deemed an unsecured claim to the extent it exceeds that value.").    Further, because the value of the Second Lien Collateral that is subject to valid, perfected liens and security interests is materially less than the face amount of the Second Lien Parties' claims, any post-petition adequate protection payment, including without limitation any interest payment, and any fees, costs, or charges, must be applied to reduce the principal amounts of the Second Lien Parties' secured claims.    *See* 11 U.S.C. § 506(b); *In re Loewen Group Int'l, Inc.*, 274 B.R. 427, 442-45 (Bankr. D. Del. 2002) (finding under section 506(b) that undersecured creditors are not entitled to post-petition interest, fees or costs) (relying on *United Sav. Ass'n of Tex. v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 372-74 (1988) ("Since [section 506(b)] permits postpetition interest to be paid only out of the

'security cushion,' the undersecured creditor, who has no such cushion, falls within the general rule disallowing postpetition interest.")).  The Committee easily satisfies the low standard requiring it to assert a colorable claim for disallowance of the Second Lien Parties' secured claims that exceed the value of the Second Lien Collateral and for reclassification of the excess amount as a general unsecured claim.

### Count XVIII – Objection to Second Lien Parties' Section 507(b) Claims

41.     The Committee believes that it is not required to obtain standing before asserting and prosecuting the claim in Count XVIII of the Complaint.  However, out of an abundance of caution, the Committee requests that the Court grant it standing to pursue this claim in the event it is determined that the Committee requires standing with respect to Count XVIII.

42.     The Second Lien Parties assert in their proofs of claim superpriority administrative expense claims pursuant to section 507(b) of the Bankruptcy Code.  However, the Second Lien Parties are not entitled to claims under section 507(b) because they have not proven that the value of the Second Lien Collateral has decreased since the Petition Date.  The protections afforded under section 507(b) of the Bankruptcy Code are available only when a creditor can show that, among other things, the value of its collateral decreased as a result of the stay of action against such property under section 362 or from the use, sale or lease of such property under section 363.  11 U.S.C. § 507(b).  The Second Lien Parties have not carried their burden to prove a decrease in value as a result of the Debtors' use of the Second Lien Collateral.  *See Baybank-Middlesex v. Ralar Distribs.*, 69 F.3d 1200, 1204-05 (1st Cir. 1995) (claims asserted under section 507(b) of the Bankruptcy Code can only be sustained where a debtor's use of collateral causes the decline in value).  Further, they have made no allegation of, much less

proven, that the value of the Second Lien Collateral declined due to the automatic stay under section 362.

43.     Moreover, in the event the adequate protection payments to the Second Lien Parties are not applied to reduce the principal amounts of the Second Lien Parties' secured claims, any post-petition diminution in value of the Second Lien Collateral that can be proven by the Second Lien Parties is not less than the amount of the adequate protection payments.  To the extent the Second Lien Parties are able to assert adequate protection claims for the value of any such diminution, there is no basis for the Second Lien Parties to recover for claims under section 507(b).  *See Bank of N.Y. Trust Co. N.A. v. Pac. Lumber Co. (In re Scopac)*, 624 F.3d 274, 282 (5th Cir. 2010) ("Section 503(b)…allows an administrative expense under § 503(b) where adequate protection payments prove insufficient to compensate a secured creditor for the diminution in the value of its collateral.").   The Committee has a colorable claim for disallowance of the Second Lien Parties' section 507(b) claims.

### *Count XIX – Objection to Allowance of Claims Pursuant to Section 502(d)*

44.     The Committee believes that it is not required to obtain standing before asserting and prosecuting the claim in Count XIX of the Complaint.  However, out of an abundance of caution, the Committee requests that the Court grant it standing to pursue this claim in the event it is determined that the Committee requires standing with respect to Count XIX.

45.     Pursuant to section 502(d) of the Bankruptcy Code, and Bankruptcy Rules 3007, 3012 and 7001, each of the Second Lien Parties' claims should be disallowed until such time as the Committee's Claims raised in the Complaint have been finally resolved.  If the Committee obtains a judgment against the Second Lien Parties for avoidance and recovery of any property, the Court must disallow any claim of the Second Lien Parties until such time as the Second Lien Parties have satisfied such judgment.  *See* 11 U.S.C. § 502(d); *In re Octagon Roofing*, 156 B.R.

214, 219 (Bankr. N.D. Ill. 1993) (creditor's claim disallowed pursuant to section 502(d) of the Bankruptcy Code where claim sought avoidance of liens and security interests and judgment had not been entered).  The Committee meets the standard of demonstrating a colorable claim for disallowance of the Second Lien Parties' claims until the Second Lien Parties have satisfied any judgment for the claims asserted in the Complaint.

**C.** **The Debtors Waived their Ability to Prosecute the Claims.**

46.    The second factor of the *Cybergenics* derivative standing test requires consideration of whether the trustee unjustifiably refused to pursue the claims.  In this case, the Debtors cannot prosecute the Claims as a result of the terms of the Final Cash Collateral Order. *See* Final Cash Collateral Order at ¶¶ 4, 22.  The Debtors' decision to waive their ability to assert any Claims against the Second Lien Parties was coerced by the necessity of the Debtors' obtaining the relief sought in the Cash Collateral Motion.  Even though the Committee asserts that the Debtors waived their ability to assert the Claims against the Second Lien Parties, the Committee sent the Debtors the Demand out of an abundance of caution in the event it is determined that the Debtors had not waived their ability to assert certain of the Claims.[9]  As noted above, the Debtors have now confirmed they will not file an action regarding the Claims only as a result of the stipulations in the Final Cash Collateral Order.

47.    Moreover, even if the Debtors had not waived their ability to assert the Claims, any refusal to pursue the Claims would be considered unjustifiable.  In determining whether a debtor's refusal to bring a claim is unjustified, courts generally conduct a cost-benefit analysis considering the probability of success and the potential costs of the litigation. *See In re Nat'l*

---

[9] Even if the Debtors' had not waived their ability to bring the Claims, the Committee represents the constituency that will benefit from successful prosecution of the Claims and as such, is properly positioned and the most desirable party to fairly and impartially assert and prosecute the Claims. *See In re McKeesport Steel Castings Co.*, 799 F.2d 91, 94 (3d Cir. 1986) (creditor had standing to pursue colorable claims where no other party would zealously pursue the claims on the creditor's behalf).

*Forge Co.*, 326 B.R. at 548 (considering whether the claims have "colorable merit and whether, in light of the probable costs of litigation, the claims would likely benefit the estate if pursued."). "A debtor's failure to bring a claim is deemed to be unjustifiable when the committee has presented a colorable claim that on appropriate proof would support recovery, and the action is likely to benefit the reorganization estate." *Adelphia Comm. Corp. v. Bank of America, N.A. (In re Adelphia Comm. Corp.)*, 330 B.R. 364, 374 n.19 (Bankr. S.D.N.Y. 2005).

48.    Any cost-benefit analysis in this case easily shows that the Claims likely will benefit the Debtors' estates by, among other things, avoiding substantial liens and security interests on the Debtors' Unencumbered Property and resolving critical issues that must be addressed before the parties can work to propose and confirm a chapter 11 plan. The benefit to the Debtors' estates warrants the Court authorizing the Committee to prosecute the Claims.

49.    The potential judgment from the Claims relates to a substantial pool of assets that may be used to fund a significant distribution to unsecured creditors. Given the value of the assets involved, even a relatively small chance of success weighs strongly in favor of the Committee's pursuit of the Claims. Here, the Committee believes that its chances of prevailing are strong, and successful prosecution of the Claims could reasonably yield tens of millions of dollars for distribution to unsecured creditors.

50.    The Committee does not anticipate that the additional costs and expenses to be incurred in connection with prosecuting the Claims will outweigh the potential recovery for the Debtors' unsecured creditors. Although litigation costs may be considered, the relevant inquiry should be limited to whether the prosecution of the Claims represents a sensible expenditure of the estates' resources. *See In re Adelphia Comm. Corp.*, 330 B.R. 364, 386 (Bankr. S.D.N.Y. 2005). The benefits of bringing the Claims far outweigh any anticipated costs and are the only

chance for a meaningful recovery to the Debtors' general unsecured creditors absent a consensual agreement with the Second Lien Parties.

51.     Based upon foregoing, the Committee has satisfied the requirements to obtain authority to prosecute, address, litigate and, if appropriate, settle the Claims and to pursue all other actions, objections and rights with respect to same.  Accordingly, the Court should grant the Committee standing as requested herein, thus satisfying the third *Cybergenics* factor.

## RESERVATION OF RIGHTS

52.     The Committee reserves its right to supplement this Motion, or file additional motions for standing, with respect to additional evidence or other claims and/or causes of action against the Second Lien Parties, and other parties, on behalf of the Debtors' estates, and to file amended complaints as necessary and permitted by applicable law.

## NOTICE AND NO PRIOR REQUEST

53.     Notice of this Motion has been provided to the following parties, or their counsel, if known: (i) the Office of the United States Trustee; (ii) the Debtors; (iii) the Second Lien Agent; (iv) the *Ad Hoc* Group of Second Lien Holders; (v) the Second Lien Indenture Trustee; and (vi) all other parties having requested notice under Bankruptcy Rule 2002.  The Committee submits that the foregoing constitutes good and sufficient notice and that no other or further notice need be given.

54.     No prior application for the relief requested herein has been made to this or any other Court.

WHEREFORE, the Committee respectfully requests that the Court enter an order (i) granting the Committee leave, standing and authority to prosecute Claims against the Second Lien Parties on behalf of the Debtors' estates, (ii) granting the Committee authority to settle such Claims if appropriate in the Committee's judgment, and (iii) granting the Committee such other relief as the Court deems just and proper.

Dated: October 5, 2015
Wilmington, Delaware

**LANDIS RATH & COBB LLP**

Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Joseph D. Wright (No. 5669)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
Email: cobb@lrclaw.com
        mcguire@lrclaw.com
        wright@lrclaw.com

-and-

**PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP**
Andrew N. Rosenberg
Elizabeth McColm
Adam M. Denhoff
1285 Avenue of the Americas
New York, New York 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
E-mail: arosenberg@paulweiss.com
        emccolm@paulweiss.com
        adenhoff@paulweiss.com

*Counsel to the Official Committee
of Unsecured Creditors*